# PERKINS ET AL. v. MATTHEWS, MAYOR OF THE CITY OF CANTON, ET AL.

No. 46.   Argued October 20, 1970—Decided January 14, 1971

BRENNAN, J., delivered the opinion of the Court in which DOUGLAS, STEWART, WHITE and MARSHALL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, in which BURGER, C. J., joined, *post*, p. 397. HARLAN, J., filed a concurring and dissenting opinion, *post*, p. 397. BLACK, J., filed a dissenting opinion, *post*, p. 401.

*Armand Derfner* argued the cause and filed a brief for appellants.

*Robert L. Goza* argued the cause for appellees. With him on the brief were *A. F. Summer,* Attorney General of Mississippi, and *William A. Allain,* Assistant Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Section 5 of the Voting Rights Act of 1965, 79 Stat. 439, 42 U. S. C. § 1973c (1964 ed., Supp. V),[1] provides that

---

[1] The full text of § 5, 42 U. S. C. § 1973c (1964 ed.. Supp. V), provides:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title are in effect

whenever a State or political subdivision covered by the Act [2] shall enact or seek to administer "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to. voting different from that in force or effect on November 1, 1964 . . . no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure" if the State or subdivision has not first obtained a declaratory judgment in the United States District Court for the District of Columbia that such qualification, prerequisite, standard, practice, or procedure "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race

---

shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief - legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court."

[2] Mississippi and its subdivisions have been determined to be covered by the Act. 30 Fed. Reg. 9897 (Aug. 6, 1965).

or color," or unless the chief legal officer or other. appropriate official of such State or subdivision has submitted the qualification, prerequisite, standard, practice, or procedure to the Attorney General of the United States "and the Attorney General has not interposed an objection within sixty days after such submission." The question in this case is. whether the city of Canton, Mississippi, was precluded by § 5 from enforcing at the 1969 elections for mayor and aldermen certain changes with respect to voting not first submitted to the Attorney General or to the District Court for the District of Columbia.

Appellants, voters and candidates for mayor or alderman, sought to enjoin the 1969 elections in this action brought in the United States District Court for the Southern District of Mississippi.[3] They alleged that the requirements at the 1969 elections differed from those in effect on November 1, 1964, and at the last mayoral and aldermanic elections in 1965 because of (1) changes in locations of the polling places, (2) changes in the municipal boundaries through annexations of adjacent areas which enlarged the number of eligible voters,[4]

---

[3] "[A]n individual may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny." *Allen v. State Board of Elections,* 393 U. S. 544, 561 (1969). We construed the statute to require such a suit to be heard by a three-judge court. *Ibid.*

[4] Appellants alleged that prior to the Voting Rights Act of 1965, less than 200 black citizens of Canton were qualified electors. At the trial of this lawsuit, one of the appellants testified that there were approximately 3,050 registered black electors and 2,850 white electors, for the 1969 election. Based on an average index of two voters per residence, the District Court concluded that the 1969 figures included approximately 82 black voters and 176 white voters from the annexations in this case. The annexations in this case also increased the land area of the city by approximately 50% and required the boundaries of all four election wards to be changed to conform to the new city limits.

and (3) a change from ward to at-large election of alder-men. The city of Canton, they alleged, sought to en-force these changes without first submitting them to the Attorney General or obtaining a declaratory judgment under § 5. Pending the convening of the court of three judges required by § 5, a single judge temporarily re-strained the elections, which were originally scheduled for the spring of 1969. The three-judge court, however, after hearing, dissolved the temporary injunction and dismissed the complaint. 301 F. Supp. 565 (1969). The elections were then held in October 1969 with the chal-lenged changes in effect.[5] We noted probable jurisdic-tion. 397 U. S. 903 (1970). We reverse.

## I

The three-judge court misconceived the permissible scope of its inquiry into appellants' allegations. Our decision in *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), handed down two months before this action was instituted, settled that question. The inquiry should have been limited to the determination whether "a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny." *Id.,* at 561. *Allen* held explicitly "[t]he only issue is whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for ap-proval before enforcement." *Id.,* at 558–559. For em-phasis, we added:

> "It is important to distinguish the instant cases from those brought by a State seeking a declaratory judgment that its new voting laws do not have a discriminatory purpose or effect. . . . In the latter

---

[5] The municipal primary elections were originally scheduled for May 13 and 20, 1969, and the municipal general elections for June 3, 1969. The primary elections were actually held October 7 and 14, and the general election October 28, 1969, after the three-judge court dissolved the temporary injunction.

type of cases the substantive questions necessary for approval (*i. e.,* discriminatory purpose or effect) are litigated, while in the cases here decided *the only question is whether the new legislation must be submitted for approval.*" *Id.,* at 555–556, n. 19 (emphasis supplied). .

The single judge who first acted in this case before the three-judge court was convened recognized that *Allen* so limited the inquiry. In his unreported oral opinion granting temporary relief, he correctly stated:

"The only questions to be decided by . . . the three judge court to be designated, [are] whether or not the State of Mississippi or any of its political subdivisions have acted in such a way as to cause or constitute a voting qualification or prerequisite to voting or standard, practice or procedure with respect to voting within the meaning of Section 5 of the Voting Rights Act of 1965, which changed the situation that existed as of November 1, 1964, and whether or not prior to doing so the City had filed a request for declaratory judgment with the United States District Court for the District of Columbia or asked for approval of the Attorney General of the United States . . . ."

He correctly observed further that, although there was no proof that the challenged annexations which changed the city's boundaries were made for the purpose of denying anyone any voting right or any right guaranteed by the Fourteenth or Fifteenth Amendments, "the case of Allen versus State Board of Elections held that it is not the function or prerogative of this Court, even if it were now sitting as a three judge court, to determine the motive of the City in extending its boundary." For *Allen* had explicitly held that, as between the United States District Court for the District of Columbia and other

district courts "Congress intended to treat 'coverage' questions differently from 'substantive discrimination' questions," 393 U. S., at 559, and therefore: "we do not consider whether this change has a discriminatory purpose or effect." 393 U. S., at 570. This is not to say that a district court limited to deciding a "coverage" question should close its eyes to the congressional purpose in enacting § 5—to prevent the institution of changes which might have the purpose or effect of denying or abridging the right to vote on account of race or color, for Congress meant to reach "the subtle, as well as the obvious, state regulations . . ." which may have that effect. 393 U. S., at 565. What is foreclosed to such district court is what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect "of denying or abridging the right to vote on account of race or color."

The single judge made the limited examination of the claims concerning boundary extensions and selection of polling places permitted by *Allen* and, on the basis of preliminary findings that both were required to be submitted under § 5, granted the temporary injunction.[6] But the three-judge court (which included the single judge) did not adhere to *Allen*'s holding. As we read the opinion of the three-judge court, the challenged changes were examined on the merits to determine whether they had "a discriminatory purpose or effect." This emerges with particular clarity in the court's consideration of the annexations. Canton's failure to obtain prior approval of the annexations was held not to violate the Act on the express ground that "the black voters still had a majority of not less than 600

---

[6] The claim concerning the change from ward to at-large election of aldermen was added by amendment.

after the expansions were effected." 301 F. Supp., at 567. Similarly, in considering the change from ward to at-large election of aldermen, as provided by a 1962 Mississippi statute, Miss. Code Ann. § 3374–36 (Supp. 1968), the court remarked, "Since a majority of the voters in Canton are black it is equally true that under the 1962 Act the black voters have the power, if they wish to be influenced by race alone to elect an all black governing body." *Id.,* at 568.

It is true that the three-judge court disclaimed reliance on lack of discriminatory effect as the basis for its holding that the change from ward to at-large election of aldermen was not covered by § 5; the court stated that its decision rested on the fact that the 1962 law antedated the Voting Rights Act of 1965 and should be complied with "regardless of whether [the city] complied in 1965." *Ibid.* It is further true that in finding "no merit" in the challenge to the relocation of the polling places, the court based the holding on proofs that "[t]he changes were made necessary because one place did not have space for voting machines, two others had to be moved because they had been situated on private property (bank lobbies) and permission to use the space had been withdrawn, and another was moved out of the courthouse to a school building because facilities were more ample and the move eliminated any interference with sessions of the various courts sitting at the courthouse." *Ibid.* Nevertheless, these considerations, so far as relevant, are relevant only to the questions reserved by § 5 for consideration by the Attorney General of the United States or the District Court for the District of Columbia.

However, in the interest of judicial economy, we shall not remand to the District Court for the making of a properly limited inquiry. The record is adequate to enable us to decide whether the challenged changes should

have been submitted for approval, and we shall, therefore, decide that question.

## II

We held in *Allen* that Congress intended that the Act be given "the broadest possible scope" to reach "any state enactment which altered the election law of a covered State in even a minor way." 393 U. S., at 566, 567. "It is significant that Congress chose not to include even . . . minor exceptions [*e. g.*, changing from paper ballots to voting machines] in § 5, thus indicating an intention that all changes, no matter how small, be subjected to § 5 scrutiny." *Id.*, at 568. Tested by that standard, each of the three changes challenged in this case falls within § 5, if not as a "voting qualification or prerequisite to voting," at all events as a "standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964."

Even without going beyond the plain words of the statute, we think it clear that the location of polling places constitutes a "standard, practice, or procedure with respect to voting." The abstract right to vote means little unless the right becomes a reality at the polling place on election day. The accessibility, prominence, facilities, and prior notice of the polling place's location all have an effect on a person's ability to exercise his franchise. Given § 5's explicit concern with both the purpose and the effect of a voting "standard, practice, or procedure," the location of polling places comes within the section's coverage. Moreover, the legislative history provides ample support for the conclusion that Congress intended § 5 to cover a change in polling places. Before the Senate Judiciary Committee, the Attorney General explicitly testified that a change in "the place of registration" and a change "from a paper ballot to a ma-

chine" were changes of the kind that § 5 was designed to reach.[7]  Plainly the relocation of the polling places is precisely the same kind of change.  Moreover, there inheres in the determination of the location of polling places an obvious potential for "denying or abridging the right to vote on account of race or color."  79 Stat. 439, 42 U. S. C. § 1973c (1964 ed., Supp. V).  Locations at distances remote from black communities or at places calculated to intimidate blacks from entering, or failure to publicize changes adequately might well have that effect. Consequently, we think it clear that § 5 requires prior submission of any changes in the location of polling places.

Changing boundary lines by annexations which enlarge the city's number of eligible voters also constitutes the change of a "standard, practice, or procedure with respect to voting."  Clearly, revision of boundary lines has an effect on voting in two ways: (1) by including certain voters within the city and leaving others outside, it determines who may vote in the municipal election and who may not; (2) it dilutes the weight of the votes of the voters to whom the franchise was limited before the annexation, and "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964).  Moreover, § 5 was designed to cover

---

[7] "The CHAIRMAN: I say, is it not a fact that the keystone of this situation is that these changes in procedures that we are talking about, like changing from a paper ballot to a machine, may not likely have the effect of denying or abridging rights guaranteed by the 15th amendment?

"Mr. KATZENBACH: . . . Even in a sense a most innocent kind of law, as our experiences have indicated time and time again, can be used.  You change the place of registration, for instance."

Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, p. 62 (1965).

changes having a potential for racial discrimination in voting, and such potential inheres in a change in the composition of the electorate affected by an annexation. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), provides a clearcut illustration of the potential of boundary changes for "denying or abridging the right to vote on account of race or color." In addition, based on the findings of an 18-month study of the operation of the Voting Rights Act by the United States Civil Rights Commission, the Commission's director reported to Congress that gerrymandering and boundary changes had become prime weapons for discriminating against Negro voters:

> "The history of white domination in the South has been one of adaptiveness, and the passage of the Voting Rights Acts and the increased black registration that followed has resulted in new methods to maintain white control of the political process.
>
> "For example, State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the act which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters. These measures have taken the form of switching to at-large elections where Negro voting strength is concentrated in particular election districts, facilitating the consolidation of predominantly Negro and predominantly white counties, and redrawing the lines of districts to divide concentrations of Negro voting strength." Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, p. 17 (1969) (remarks of Mr. Glickstein).[8]

---

[8] One Congressman who had supported the 1965 Act observed, "When I voted for the Voting Rights Act of 1965, I hoped that 5 years would be ample time. But resistance to progress has been more subtle and more effective than I thought possible. A whole

In *Fairley* v. *Patterson*, 393 U. S. 544 (1969), a companion case to *Allen*, this Court held that § 5 applied to a change from district to at-large election of county supervisors on the ground that

> "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot: See *Reynolds* v. *Sims*, 377 U. S. 533, 555 (1964)." 393 U. S., at 569.

MR. JUSTICE HARLAN's separate opinion in that case accurately recognized that the Court's holding rested on its conclusion that "Congress intended to adopt the concept of voting articulated in *Reynolds* v. *Sims*, 377 U. S. 533 (1964), and protect Negroes against a dilution of their voting power." *Fairley* v. *Patterson, supra,* at 588. In terms of dilution of voting power, there is no difference between a change from district to at-large election and an annexation that changes both the boundaries and ward lines of a city to include more voters. We follow *Fairley* and hold that § 5 applies to the annexations in this case.

Our conclusion that both the location of the polling places and municipal boundary changes come within § 5

---

arsenal of racist weapons has been perfected. Boundary lines have been gerrymandered, elections have been switched to an at-large basis, counties have been consolidated, elective offices have been abolished where blacks had a chance of winning, the appointment. process has been substituted for the elective process, election officials have withheld the necessary information for voting or running for office, and both physical and economic intimidation have been employed.

"Section 5 was intended to prevent the use of most of these devices. But apparently the States rarely obeyed the mandate of that section, and the Federal Government was too timid in its enforcement." Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, pp. 3–4 (1969) (remarks of Rep. McCulloch).

draws further support from the interpretation followed by the Attorney General in his administration of the statute. "[T]his Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). The Attorney General's interpretation was recently reported by officials of the Department of Justice in testimony related to the extension of the 1965 Act.[9] They testified that the Department regarded relocating polling places and annexing territory [10] as fall-

---

[9] Congress has extended the life of the 1965 Act, including § 5, from 1970 to 1975. Voting Rights Act Amendments of 1970, Pub. L. 91–285, 84 Stat. 314.

[10] In its *amicus* brief filed in this Court in *Fairley* v. *Patterson,* No. 25, O. T. 1968, the Government took the position that § 5 applied to "laws [that] substantially change the constituency of certain elected officials . . . . There is surely no doubt today that the right to vote can be curtailed as effectively by an impermissible demarcation of an elected official's constituency as by the destruction of ballots or the refusal to permit access to the voting booth." Memorandum for the United States as *Amicus Curiae* 13. While the Government was arguing there that § 5 reached a change from ward to at-large elections, its interpretation is equally germane to the boundary annexations in the present case. MR. JUSTICE HARLAN argues that the apparent clarity of the Department's position, taken before congressional committees and before this Court, is clouded by the Department's failure to challenge unsubmitted annexations in covered States. However, the Government, in its *amicus* brief in *Fairley,* specifically denied that any significance could be attributed to the Government's failure to bring suit. In arguing that § 5 applied to redistricting and reapportionment in States covered by the Act, the Government stated:

"Nor can the Attorney General's failure to [bring suit] in cases involving reapportionment and redistricting be properly viewed as undermining these Section 5 cases or refuting the clear congressional intent that that provision should be given broad scope. The most that can be assumed from past silence is that the Attorney General was not prepared to interpose an objection to the changes being

ing within the Act. Their testimony also indicated that this interpretation was accepted by at least some affected States and political subdivisions, which had submitted such changes for the Attorney General's approval. Hearings on Amendments to the Voting Rights Act of 1965 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 248 (1969), *id.*, 2d Sess., 506 (1970).

In support of this testimony, the Justice Department submitted a formal table showing the 313 changes in laws with respect to voting which had been submitted to the Attorney General and acted upon by him between 1965 and 1969. The Department divided its responses to these

---

effected . . . ." Memorandum for the United States as *Amicus Curiae, supra,* at 22.

Moreover, there is no indication that the Attorney General or other Justice Department officials were aware of the boundary changes referred to in the dissenting opinion; no mention of them appears in any of the extensive congressional materials on the Justice Department's enforcement activities under § 5, submitted to Congress in relation to the recent extension of the Act from 1970 to 1975. Hearings on Amendments to the Voting Rights Act of 1965 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st and 2d Sess. (1969, 1970); Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3 (1969). Finally, attributing significance to any apparent failure of the Government to act is particularly hazardous in this case. Section 5 was enacted in large part because of the acknowledged and anticipated inability of the Justice Department—given limited resources—to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act. See n. 13, *infra.* For that reason, § 5 places the burden on the affected polities to submit all changes for prior approval. That the Department may have been unable to discover and investigate changes not reported to it should not, in these circumstances, be surprising, and does not cast any serious doubt on explicit official statements of the Department's interpretation of the statute.

submissions into three categories: (1) changes that the Department did not consider within the scope of § 5; (2) changes that the Department considered within the scope of § 5, but to which the Department did not object; and (3) changes within the scope of § 5 to which the Department objected as discriminatory. Every change in boundary or election district lines [11] as well as every

---

[11] The table reflects the fact that only South Carolina has complied rigorously with § 5. Through June 1969, it submitted 252 changes for approval, including all three annexations (and one consolidation) that were approved by the state legislature between 1965 and 1969. No political subdivisions of South Carolina, however, submitted any changes on their own initiative. Georgia and its subdivisions had submitted 60 changes for approval, including one annexation, one consolidation of election districts, and two changes in the lines of election districts. It is true that the Georgia Session Laws reflect numerous annexations that were not submitted to the Attorney General. It is also true that the Georgia Session Laws reflect at least an equal number of changes, obviously covered under any interpretation of § 5, that were also not submitted. For example, in 1965, the Georgia State Legislature enacted the following acts, each applicable to one municipality, which were not submitted to the Attorney General: four acts changing voter qualifications in municipal elections, three acts changing municipal elections from paper ballots to voting machines, four acts completely revising municipal election codes, and two acts requiring a majority vote, instead of a plurality, for election of city officials. In 1968, the Georgia State Legislature enacted the following acts, each applicable to one municipality, which were not submitted to the Attorney General: seven acts changing the dates of municipal elections and increasing the terms of municipal officials, one act creating a voter residency requirement and an oath to be taken by all voters, one act changing the number of aldermen and requiring a majority vote for election of aldermen, one act changing voter qualifications, and one act completely revising a municipal election code. Nor is this an exhaustive list even for those two years. The remaining four States covered by the Act—Mississippi, Alabama, Louisiana, and Virginia—have submitted a combined total of 33 changes. The only conclusion to be drawn from this unfortunate record is that only one State is regularly complying with § 5's requirement.

change in polling places shown in that table was considered by the Department to be within the scope of § 5. Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, pp. 308–313 (1969).

The change from ward to at-large elections of all aldermen was of course a change within the coverage of the Act. *Fairley* v. *Patterson, supra,* is dispositive of that question. However, the question arises in this case in a peculiar context. The change to at-large elections was mandated by a Mississippi statute enacted in 1962. But Canton ignored the mandate in the conduct of the 1965 municipal elections and, as in 1961, elected aldermen by wards.[12] Canton now argues that it had no choice but to comply with the 1962 statute in the 1969 elections.

We have concluded, nevertheless, that the change to at-large elections required federal scrutiny under § 5. That section in express terms reaches any standard, practice, or procedure "different from that in force or effect on November 1, 1964." In our view, § 5's reference to the procedure "in force or effect on November 1, 1964," must be taken to mean the procedure that would have been followed if the election had been held on that date. That judgment is necessarily a matter of inference in this case since Canton did not hold a munipical election on November 1, 1964. But in drawing that inference, there is little reason to blind ourselves to relevant evidence in the record by restricting our gaze to events that occurred before that date. Ordinarily we presume that officials will act in accordance with law. See *First National Bank of Albuquerque* v. *Albright,* 208 U. S. 548, 553 (1908). If the only available facts showed that Canton conducted its 1961 election by wards but that the

---

[12] The reason for Canton's failure to conform its election to state law does not appear in the record. On oral argument, appellee's counsel stated that the lapse was due to his overlooking the 1962 law.

Mississippi Legislature had subsequently enacted a statute in 1962 requiring future municipal elections to be held at large, Canton officials would be entitled to the weight of that presumption.

With the benefit of hindsight, however, we know that Canton elected its aldermen by wards in its June 1965 municipal election. The record reflects no relevant change between November 1964 and June 1965 to suggest that a different procedure would have been in effect if the elections had been held seven months earlier Consequently, we conclude that the procedure *in fact* "in force or effect" in Canton on November 1, 1964, was to elect aldermen by wards. That sufficed to bring the 1969 change within § 5. As was the case in *Allen*, "It is clear, however, that the new procedure with respect to voting is different from the procedure in effect when . . . [Canton] became subject to the Act . . . ." 393 U. S., at 570. The bearing of the 1962 statute upon the change was for the Attorney General or the District Court for the District of Columbia to decide.

### III

The appellants have urged that, in addition to reversing the District Court judgment, the Court should set aside the elections held in October 1969, and order new elections held forthwith in which the changes challenged in this case may not be enforced. In *Allen* we declined a like invitation and gave that decision only prospective effect, primarily because the scope of § 5 coverage was then an issue of first impression and "subject to rational disagreement." 393 U. S., at 572. That reasoning is inapplicable in this case since *Allen* was decided two months before the originally scheduled dates of the Canton elections.

In arguing for new elections, appellants emphasize the desire of Congress to ensure that States and subdivisions

covered by the Act not institute new laws with respect to voting that might have a racially discriminatory purpose or effect. On the basis of the legislative history, there is little question that Congress sought to achieve this goal by relying upon the voluntary submission by affected States and subdivisions of all changes in such laws before enforcing them. Failure of the affected governments to comply with the statutory requirement would nullify the entire scheme since the Department of Justice does not have the resources to police effectively all the States and subdivisions covered by the Act, see *Allen,* 393 U. S., at 556, and since private suits seem unlikely to sufficiently supplement federal supervision. Moreover, based upon ample proof of repeated evasion of court decrees and of extended litigation designed to delay the implementation of federal constitutional rights, Congress expressly indicated its intention that the States and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays in litigation.[13]

At the same time, we recognize that, in determining the appropriate remedy, other factors may be relevant, such as the nature of the changes complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5. In certain circumstances, for example, it might be appropriate to enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so or if the required federal

---

[13] *E. g.,* Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, pp. 60, 72 (1965); Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, pp. 14–17 (1965); 111 Cong. Rec. 10727 (1965) (remarks of Sen. Tydings); *id.,* at 15645, 15648 (remarks of Rep. Celler); *id.,* at 16221 (remarks of Rep. Corman). Opponents of the Act also recognized the severity of § 5's requirements. *E. g., id.,* at 10725 (remarks of Sen. Talmadge); *id.,* at 15657 (remarks of Rep. Willis).

approval is not forthcoming. Since the District Court is more familiar with the nuances of the local situation than are we, and has heard the evidence in this case, we think the question of the appropriate remedy is for that court to determine, in the first instance, after hearing the views of both parties.[14]

The judgment of the District Court is reversed, and the case is remanded to that court with instructions to issue injunctions restraining the further enforcement of the changes until such time as the appellees adequately demonstrate compliance with § 5, and for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

Given the decision in *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969), a case not cited by the District Court, I join in the judgment of reversal and in the order of remand.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

Our role in this case, as the Court correctly recognizes, is limited to determination whether § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c (1964 ed., Supp. V), required the city of Canton to obtain federal approval of the way it proposed to run its 1969 elections. For this reason, I am unable to join the dissenting opinion of MR. JUSTICE BLACK, *post*, p. 401, although, like him, I see little likelihood that the changes here involved had a discriminatory purpose or effect.

---

[14] We add only one restriction: If the District Court decides that a new election is required, Canton should be permitted to enforce any changes at the new election for which it can obtain federal approval.

I agree with the Court, and for substantially the reasons it gives, that the city should have submitted the relocation of polling places for federal approval. But I cannot agree that it was obliged to follow that course with respect to the other two matters here at issue.

I

Whether or not Congress could constitutionally require a State to submit all changes in its laws for federal approval, cf. *South Carolina* v. *Katzenbach,* 383 U. S. 301, 358–362 (1966) (separate opinion of BLACK, J.), the Voting Rights Act does not purport to do so. Section 5 requires submission of changes "with respect to voting" only. The Court seems to interpret this restriction as including any change in state law which has an effect on voting, if changes of that type have "a potential for racial discrimination in voting." *Ante,* p. 389. The limitation implied by the latter clause will prove meaningless as a practical matter. Given a change with an effect on voting, a set of circumstances may be conceived with respect to almost any situation in which the change will bear more heavily on one race than on another. In effect, therefore, the Court requires submission of any change which has an effect on voting. I think it plain that the statutory phrase—"with respect to voting"—was intended to have more limited compass.

The legislative history of the Voting Rights Act was examined in the majority opinion and a separate opinion in *Allen* v. *State Board of Elections,* 393 U. S. 544, 564–571, 588–591 (1969). No useful purpose would be served by retraversing ground covered there. The Court concluded from its review of the history that § 5 was "intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.,* at 566. The Court's opinions in both *Allen* and this case are devoid of evidence of a legislative intent to go beyond

the State's election law and to reach matters such as annexations, which affect voting only incidentally and peripherally. *Fairley* v. *Patterson*, decided with *Allen*, and the remarks of the Solicitor General in his *amicus* brief in that case are plainly distinguishable on this basis. At least in the absence of a contrary administrative interpretation, I would not go beyond *Allen* to hold that annexations are within the scope of § 5. The Court's assertion that the Attorney General does in fact interpret the Act differently seems to me to give too much weight to the passing remark of an Assistant Attorney General. Cf. *Allen* v. *State Board of Elections*, 393 U. S., at 568–569.[1]

## II

*Fairley* v. *Patterson* held that a change from election by districts to election at large was within the scope of § 5. The question for determination here is which of the two procedures was "in force or effect on November 1,

---

[1] The fact that the Attorney General has expressed his opinion on the merits of the handful of border changes which have been presented to him, rather than dismissing them as not within the scope of § 5, seems to me to be entitled to little weight in the face of the enormous number of annexations which have not been submitted to him and which he has done nothing about. In the fiscal year beginning July 1, 1967, there were over 40 municipal annexations in South Carolina. 1967–1968 Report of the Secretary of State of South Carolina 165–166. None of these were submitted for the approval of the Attorney General. Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, pp. 310–312 (1969). The Georgia Session Laws for the years 1965 to 1969 reveal over 100 boundary changes in Georgia cities. Only one was submitted to the Attorney General, and that one also involved redrawing of ward lines. So far as the face of the statute, Act of March 2, 1966, No. 235, Ga. Laws 1966, p. 2729, reveals, the redrawing of ward lines may have completely altered the political map of the city. In the case at hand, the old ward lines were simply extended to the new city limits.

1964." The Court interprets the quoted phrase to mean the procedure which probably would have been followed if an election had been held on the crucial date, regardless of the provisions of controlling state law. While this interpretation is not wholly unreasonable, I find it unlikely that it is the one Congress would have preferred if it had thought about the problem. Resolution of the hypothetical factual question required by the Court's test would be quite inconvenient, if not unmanageable, for the Attorney General or the District Court for the District of Columbia, far from the scene.[2] Moreover, under the Court's test, results may turn on the seeming fortuity that in the first election after November 1, 1964, local officials forgot about a controlling statute of statewide application and no private citizen brought suit to have the election set aside. Barring state attempts to resurrect long-ignored statutes, I would interpret "procedure . . . in force or effect on November 1, 1964," to mean the procedure required by state law. Under this interpretation I would hold that the change from election by wards to election at large occurred on the effective date of the 1962 state statute, and therefore that it did not require approval under § 5.

### III

I must confess that I am somewhat mystified by the Court's discussion of the appropriate remedy in this case. For the reasons set out in my partial dissent in

---

[2] Assuming that the statute requires determination of this hypothetical factual question, I would have thought that it should be passed on by the District Court in the first instance. The record is simply too sparse to reveal why the 1962 statute was not followed in 1965, or whether the same cause would have been operative a year earlier. If the defendants are not entitled to prevail on the theory that the plaintiffs failed to come forward with adequate proof of the procedure in force or effect in 1964, they are at least entitled to a hearing at which they may address themselves to the issue.

*Allen,* 393 U. S., at 593–594, I would direct the holding of new elections if, and only if, the city fails to obtain approval from the appropriate federal officials within a reasonable time. If such approval is forthcoming, I see no justification for requiring a rerun of the 1969 elections. See the opinion of MR. JUSTICE BLACK, *post,* this page. If the approval is not forthcoming, the fact of violation of the federal statute, as interpreted by this Court, and the possibility that the changes had a discriminatory purpose or effect seem to me to require new elections in the absence of exceptional circumstances which I cannot now foresee. In any event, the District Court is entitled to more guidance on this score than the Court provides.

MR. JUSTICE BLACK, dissenting.

In *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), this Court upheld the Voting Rights Act of 1965 as a legitimate exercise of congressional power to enforce the provisions of the Fifteenth Amendment. I agreed with the majority that Congress had broad power under § 2 of the Fifteenth Amendment to enforce the ban on racial discrimination in voting. However, I dissented vigorously from the majority's conclusion that every part of § 5 of the Voting Rights Act was constitutional. The fears which precipitated my dissent in *Katzenbach* have been fully realized in this case. The majority, relying on *Katzenbach,* now actually holds that the City of Canton, Mississippi, a little town of 10,000 persons, cannot change four polling places for its election of aldermen without first obtaining federal approval.

Section 5 of the Voting Rights Act provides that no political subdivision subject to the Act may adopt any voting law or election practice different from that in effect on November 1, 1964, without first going all the way to Washington to submit the proposed change to the United States Attorney General or to obtain a favor-

able declaratory judgment from the United States District Court for the District of Columbia.[1] I have stated my belief, in dissents in *Katzenbach* and *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969), that this section of the Voting Rights Act of 1965 violates the United States Constitution because it deprives a few States and their political subdivisions of the power to make their own laws and govern themselves without advance federal approval. Under our Constitution as the Founding Fathers drafted it and as the people have adopted and amended it, I believe the power of the States to initiate and enforce their own laws cannot be so easily taken away.

This case poignantly demonstrates the extent to which the Federal Government has usurped the function of local government from the local people to place it in the hands of the United States District Court for the District of Columbia and the United States Attorney General, both being over a thousand miles away from Canton, Mississippi. The last election for aldermen in the City of Canton before the one here in issue was held in 1965. If the procedures used in the 1965 election had been used in the 1969 election, four of the five aldermen would have been elected from wards. In two of these wards white voters were in a majority and in the other two black voters were in a majority. One alderman would have been elected at large. The city adopted three changes for the 1969 elections. Detailed consideration of these changes shows that they pertained solely to local concerns in which the National Government has no proper interest and did not involve racial discrimination.

*Polling Places.*—The city altered four of the local polling places. Two were moved because the old polling places had been located on private property and the

---

[1] Voting Rights Act of 1965, § 5, 42 U. S. C. § 1973c (1964 ed., Supp. V).

owners would no longer consent to the use of their property for voting. I find it incredible to believe that Congress intended that the people of Canton would have to travel to Washington to get the Attorney General's consent to rent new polling places. Another polling place was moved because the old one did not have sufficient space to accommodate voting machines. Finally, the fourth place was moved from a courthouse to a public school to eliminate interference with courtroom proceedings. It is difficult for me to imagine a matter more peculiarly and exclusively fit for local determination than the location of polling places for the election of town aldermen. Nor is there the slightest indication that any of these changes were motivated by or resulted in racial discrimination. The United States District Court unanimously agreed on undisputed evidence that the appellants' attack on the changes in polling places had "no merit." [2] Yet, the majority of this Court has now decided that the City of Canton cannot move its polling places without first submitting the proposed change to the politically appointed Attorney General or a District Court over a thousand miles away. Presumably, the majority is ready to hold, if necessary, that the City of Canton could not change from ballots to voting machines without obtaining similar federal approval. I dissent from any such utter degradation of the power of the States to govern their own affairs.

*Boundary Extensions.*—The majority also finds that Canton violated the Act by making three separate extensions of the City's boundaries between 1965 and 1969. The 1965 extension of the city limits added 46 Negro voters to the voter registration rolls. *That annexation added no white voters.* The 1966 annexation added 28 black voters and 187 white voters. The 1968 annexation added eight black voters and 144 white voters. In sum,

[2] 301 F. Supp., at 568.

the three extensions added 82 black voters and 331 white voters. These figures must be viewed in relation to the voting population of the city on January 12, 1969, when there were 2,052 white voters and 2,794 Negro voters.[3] It is apparent that even if these 1969 figures included no voters from the annexed areas, the additions would not alter the racial balance of voters in Canton. Moreover, it is undisputed that at the time of the election in question an absolute majority of the voters in Canton was black. Finally, the District Court found that the annexations were not part of "a stratagem deliberately designed to overturn a black majority at the municipal polls." [4]

In my view, the Constitution prohibits the Federal Government from requiring federal approval of state laws before they can become effective. Proposals for such congressional veto power over state laws were made at the Constitutional Convention and overwhelmingly rejected.[5] The Fourteenth Amendment did not alter the basic structure of our federal system of government. The Fourteenth Amendment did bar discrimination on account of race and did give the Federal Government power to enforce the ban on racial discrimination. In this case the Congress has attempted to enforce the ban on racial discrimination by requiring the States to submit their laws or practices to federal approval even before they are initiated. In my view that requirement attempts to accomplish the constitutional end of banning racial discrimination by a means—requiring submission of proposed state laws to the Attorney General—that violates the letter and the spirit of the Constitution. But here the Court goes even further: it permits the

---

[3] *Id.*, at 566–567.

[4] *Id.*, at 567.

[5] See Debates in the Federal Convention of 1787 as reported by James Madison in Documents Illustrative of the Formation of the Union of American States 605, 789, 856 (1927).

use of an unconstitutional means in a case where the *parties have not shown racial discrimination.*

*At-large Elections.*—In 1962, before Congress enacted the Voting Rights Act of 1965, Mississippi passed a state statute requiring cities to conduct all elections for aldermen by having all candidates run at large.[6] For some reason not revealed in the record, the City of Canton failed to comply with that law in the 1965 elections for aldermen. The majority now holds that because Canton violated Mississippi law in the 1965 elections, the city must violate the same law again in future elections unless the officials of Canton secure federal permission to abide by the admittedly valid law of their State.

In my view Congress did not intend and the Constitution does not permit such a perversion of our federal system of government. Nor can the majority support its unprecedented decision on the grounds of racial discrimination. It is beyond my comprehension how the change from wards to an at-large election can discriminate against Negroes on account of their race in a city that has an absolute majority of Negro voters.

One vice of § 5 is that it attempts to shortcut the Federal Government's job in policing racial discrimination in voting by radically curtailing the power of certain States to conduct their own elections while leaving other States wholly free of any such restraint. Moreover, § 5

---

[6] Chapter 537 of the Laws of Mississippi of 1962, provides:

"All aldermen shall be selected by vote of the entire electorate of the municipality. Those municipalities which determine to select one alderman from each of the four (4) wards shall select one from the candidates for alderman from each particular ward who shall be a resident of said ward by majority vote of the entire electorate of the municipality."

A strong argument can be made that this statute was "procedure with respect to voting . . . in force or effect on November 1, 1964," in which case the officials of Canton were prohibited by the Voting Rights Act from *not enforcing* it absent federal approval.

is unnecessary to the enforcement of the Voting Rights Act and can only serve to cause irritation and pernicious divisiveness in those States to which it applies. When Mississippi or any other State abridges the rights of citizens on account of race, the proper course for the United States is to institute suit in a federal court to have the discriminatory practice halted. Of course, in such proceedings, the state statute or practice is presumed valid, and it is up to the Attorney General to prove that the challenged act or practice is discriminatory. *Only after discrimination has been established* does the Federal Government have the power under the Fourteenth Amendment and the Supremacy Clause to interfere with the State's conduct of its own affairs.

This Act attempts to reverse the proper order of things. Now the Congress presumes—a presumption which the Court upholds—that state statutes regulating voting are discriminatory and enjoins their enforcement until the State can convince distant federal judges or politically appointed officials that the statute is not discriminatory. This permits the Federal Government to suspend the effectiveness or enforcement of a state act *before* discrimination is proved. But I think the Federal Government is without power to suspend a state statute before discrimination is proved. The inevitable effect of such a reversal of roles is what has happened in this case—a nondiscriminatory state practice or statute is voided wholly without constitutional authority.

Except as applied to a few Southern States in a renewed spirit of Reconstruction, the people of this country would never stand for such a perversion of the separation of authority between state and federal governments. Never would New York or California be required to come begging to the City of Washington before it could enforce the valid enactments of its own legislature. Never would this law have emerged from

congressional committee had it applied to the entire United States. Our people are more jealous of their own local governments than to permit such a bold seizure of their authority.[7]

Finally, I dissent from the remedy adopted by the Court. The majority adds insult to injury by remanding this case to the District Court with instructions to determine whether Canton should be required to hold a new election. This Court has always heretofore been rightly hesitant in interfering with elections even for the grossest abuses. The majority now departs from our many precedents for restraint in election cases and suggests to the District Court that it may be appropriate to invalidate the 1969 election and require the village to undergo the great expense and tremendous disruption of a new election. Such a remand of this case is inappropriate for at least two reasons. First, the majority's decision is not predicated upon any actual discrimination against voters by the city of Canton, but merely upon a failure to seek federal approval for *de minimis* changes in its election machinery. The majority does not pretend that any actual discrimination has been proved in this case. Ci-

---

[7] Section 5 of this Act and its enforcement by the Court is reminiscent of treatment accorded the Colonies by the British King. Some of the Colonies' complaints of July 4, 1776, were:

"He has refused his Assent to Laws, the most wholesome and necessary for the public good.—He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them.—He has refused to pass other Laws for the accommodation of large districts of people, unless those people would relinquish the right of Representation in the Legislature, a right inestimable to them and formidable to tyrants only.—He has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public Records, for the sole purpose of fatiguing them into compliance with his measures. . . ." Declaration of Independence (July 4, 1776).

tations to the finding of the United States Civil Rights Commission about past instances of racial discrimination and to statements made by Congressmen who supported the 1965 Voting Rights Act do not prove discrimination in this case. In the absence of affirmative proof of racial discrimination, I believe it would be an abuse of any remedial discretion that may be vested in the federal judiciary to compel Canton to hold a new election. Second, I believe that in remanding this case, my Brethren are neglecting their constitutional duty to decide an issue necessary to the full disposition of this case. This case has been in litigation since May 1969 and the election has already been postponed once. By the time the majority's mandate is acted upon by the District Court and we have disposed of the jurisdictional statement which will inevitably follow, Canton's 1973 elections will be just around the corner. In this posture, to require a new election would not be a remedy for a constitutional or statutory wrong but a harsh and oppressive punishment wholly unwarranted by the facts of this case. Moreover, an order directing a new election would be a "shotgun" sanction, damaging all of the candidates and all of the people in Canton. Useless campaign expenses would have to be borne by both white and black candidates. And the town, through property or sales taxes imposed on all citizens, black or white, rich or poor, would have to collect tax money to pay the expenses of a new election. I need not remind the District Judges below that elections are expensive and that all southern towns are not rich. I am convinced that if the majority were to confront the issue of an appropriate remedy now, the Court would not void the election or compel the city to hold a new election. To the contrary, the 1969 election would be upheld because the alleged violations of the Act are so very minor and so clearly technical. We should not forget that while it is easy for judges to order

new elections, it will be neither easy nor inexpensive for the little city of Canton to comply with such an order.

For the reasons set out above and in my dissents in *South Carolina* v. *Katzenbach, supra,* and *Allen* v. *State Board of Elections, supra,* I would affirm the judgment of the United States District Court.[8]

---

[8] My Brothers THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN have stated that "[g]iven the decision in *Allen* v. *State Board of Elections* . . . [they] join in the judgment" of the Court in this case. I have to admit that I do not precisely understand what they mean by "given *Allen.*" Neither THE CHIEF JUSTICE nor MR. JUSTICE BLACKMUN was a member of the Court when *Allen* was decided. They are certainly not bound by the Court's past mistakes if they think, as I do, that *Allen* was a mistake. Yet, I do not understand that "given *Allen,*" necessarily means that they now agree to what was decided in that case. I believe that *Allen* was wrongly decided and would overrule it now. Moreover, I do not believe that acceptance of the Court's decision in *Allen* necessitates compelling the city of Canton to seek the Attorney General's consent to either the changes in local polling places or the other changes at issue in this case.