Charles EVERS et al., Plaintiffs,

v.

**STATE BOARD OF ELECTION COM-
MISSIONERS et al., Defendants.**

Civ. A. No. 4805.

United States District Court,
S. D. Mississippi,
Jackson Division.

April 27, 1971.

Constance Iona Slaughter, Frank R. Parker, Jackson, Miss., and John C. Brittain, Jr., Oxford, Miss., for plaintiffs.

Jesse R. Adams, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants.

Before CLARK, Circuit Judge, and RUSSELL and NIXON, District Judges.

PER CURIAM:

Plaintiffs bring the present class action suit for declaratory and injunctive relief against the enforcement of newly enacted legislation to alter and amend Mississippi laws governing the qualification of candidates for elective office, the conduct of political campaigns and other procedures for holding elections. The laws enacted are claimed to be violative of Section 5 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973c), Article I, Sections 2 and 4; Article II, Section 1, and the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States. Two applicants have moved the Court for leave to intervene to assert additional objections based upon Article 1, Section 3 and the Seventeenth Amendment to the Constitution and 2 U.S.C.A. Sections 1 and 7.

Mississippi is an "off-year" election state which has historically held its general elections for all offices from Constable in each county beat to Governor, during the summer and fall of the year preceding Presidential election years. The deadlines for qualification by candidates under existing Mississippi election law procedures fall in the early part of June, 1971, hence we have expedited the hearing and disposition of this cause.

If we were free to perform our judicial duties according to our ability and agreeably to our understanding of the Constitution of the United States we would, to a man, concur with Mr. Justice Black's views that Section 5 of the Voting Rights Act of 1965 is clearly un-

constitutional.[1] This Section 5 imposes a prior restraint upon certain of the sovereign States by enjoining the enforcement of statutes they may enact until they can convince federal judges of a district foreign to their soil that these presumptively valid acts of their duly elected legislature pass Constitutional muster, or until their chief legal officer has submitted such statutes to a political appointee of the Executive Department of the central government for his review and tacit approval. Unfortunately the Constitutional principle created, which ostensibly extends only to States of the former Confederacy in voting matters, will endure to haunt all of the union whenever the cause of the moment—be it water rights in California or pollution in New York—finds disfavor with majority national opinion.[2]

In the case at bar, the application of the vicious "conquered province" theory embodied in this section is uniquely opprobrious because the State of Mississippi's humiliation in bringing its laws to Washington for bureaucratic approval has been met with an obtuse, patronizing failure by the federal government official to discharge the duties Congress placed upon him. The unhappy result is that additional coals of discord are heaped upon the head of an already strained federalism.

However, as members of an inferior court, we are bound to follow the precedent set by the majority of the Supreme Court and to apply Section 5 to the same extent as if we considered it to have pristine authority.

In Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), the Supreme Court instructed a three-judge court considering a challenge to changes in locations of polling places and other elementary mechanics of a county election to limit its function first to a determination of whether the particular State requirements presented to it are covered by Section 5, then second, if covered, to a finding of whether the requirements have been "subjected to the required federal scrutiny." See also Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

1. Mr. Justice Black's dissents setting forth these views are: South Carolina v. Katzenbach, 383 U.S. 301, 355–362, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); Allen v. State Board of Elections, 393 U.S. 544, 595–597, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); and Perkins v. Matthews, 400 U.S. 379, 401–409, 91 S.Ct. 431, 443–447, 27 L.Ed.2d 476 (1971).

2. Mr. Justice Black stated unequivocally that this legislation would never have gotten past a congressional committee had it had a broader geopolitical impact. These were his strong words:

"Except as applied to a few southern States in a renewed spirit of Reconstruction, the people of this country would never stand for such a perversion of the separation of authority between state and federal governments. Never would New York or California be required to come begging to the City of Washington before they could enforce the valid enactments of their own legislatures. Never would this law have emerged from congressional committee had it applied to the entire United States. Our people are more jealous of their own local governments than to permit such a bold seizure of their authority.[7] "

7. Section 5 of this Act and its enforcement by the Court is reminiscent of treatment accorded the Colonies by the British King. Some of the Colonies' complaints of July 4, 1776, were:

"He has refused his Assent to Law, the most wholesome and necessary for the public good.—He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained: and when so suspended, he has utterly neglected to attend to them.—He has refused to pass other Laws for the accommodation of large districts of people, unless those people would relinquish the right of Representation in the Legislature, a right inestimable to them and formidable to tyrants only.—He has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of the public Records, for the sole purpose of fatiguing them into compliance with his measures."

■ Obviously, if an ordinance moving the location of a voting box from Mrs. Jones's front porch to Brown's grocery is presumptively void until a Washington, D. C. court or official scrutinizes it, then the statewide enactments changing the basic manner in which political elections are to be held which are challenged here, are covered by the act. Certainly the State thought so, for it submitted its two laws in question for such examination by the Attorney General of the United States.

The second question then confronts us —have these enactments been "subjected to the required federal scrutiny"? Since they have never been considered by the District Court of the District of Columbia, the question is whether the Attorney General of the United States has given them the examination demanded by the act.

Set into the context of the present dispute, the rule of Section 5 may be paraphrased as follows. When the State of Mississippi shall enact a voting procedure different from the procedures in effect in 1964, the State shall not give effect to the law unless it shall institute an action in the United States District Court for the District of Columbia and receive a declaratory judgment from the court that such procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race. *Provided,* the new law may be put into effect without such court proceedings, if the law has been submitted to the Attorney General of the United States and he has not interposed an objection within 60 days after the law was submitted.

■ The issue which Section 5 requires be presented in a court declaratory judgment action is explicit—does the law have the purpose or effect of denying or abridging the right to vote on account of race? Although implicit, we hold that the duty imposed upon the Attorney General of the United States is the same. To make sense, Section 5 must be construed to contemplate that the Attorney General will make a determination of whether a covered change submitted to him has the purpose or effect of denying or abridging the right to vote on account of race. The Supreme Court precisely equated this judicial and executive responsibility in its decision in Perkins v. Matthews, *supra,* in these words: "What is foreclosed to such district court is what Congress expressly reserved for consideration by the District Court of the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.' "

The problem for Mississippi in the case at bar is that having done what Congress humbled her to do, she did not receive a letter of approval, or a disapproval or a mere failure to interpose an objection within the statutory time. Rather, she received a lengthy, Pilate-like response in which the Attorney General recognized he had the very duty we declare the statute imposed upon him, bemoaned Congress's failure to accept his predecessor's suggestion to leave the matter to the courts, declared that he was not prepared to make the determinations required by the act, but made no literal objection. The full text of that letter is as follows:

"This is in response to your submission of House Bills 362 and 363 (The "Open Primary" Law) which you submitted on July 28, 1970, to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965.

Under the Voting Rights Act submitted legislation may be enforced if the Attorney General has not interposed an objection within 80 days after submission. Such an objection is entered when the legislation has the "purpose" or the "effect" of "denying the right to vote on account of race or color."

Since receiving this submission we have carefully examined these acts in light of the statutory standards. We have also solicited additional facts from various knowledgeable sources in Mississippi as to the legislative "purpose"

and "effect," and, in fact, are still in the process of receiving and analyzing the considerable information furnished in response to our inquiries.

The problem posed by these enactments is extremely complex. As you know the acts in question eliminate party primaries in most elections and provide for a two-step general election in which all candidates participate with the two highest participating in a run-off election. The Voting Rights Act requires the Attorney General to determine the purpose with which the legislature acted and to project the effect that the statutes will have. With respect to the Open Primary bills the contention of some is that one purpose of the acts is to deny the independent Negro candidates the opportunity which they have under existing law to run for and be elected to office in the general election with a plurality of the votes cast. While this purpose is not apparent on the face of the acts, there appear to be some indications from the reported statements of proponents and the statements of purpose made with respect to prior similar proposals, that support this view. If this were established as a significant purpose of the acts I believe they would be objectionable under the Voting Rights Act and under applicable judicial precedents.

On the other hand, the facts presently available to us do not conclusively establish that the present acts are afflicted with a racial purpose or that there is no other compelling reason for the State to have adopted them. Moreover, we have been unable to reach the conclusion that the projected effect would be to deprive Negro voters of rights under the Voting Rights Act.

Under the law, the determination of issues such as legislative purpose and effect, involves the detailed consideration of voluminous materials and, if done fairly and comprehensively, an analysis of fact and law that we have simply been unable to complete within the alloted time. I note in passing that the complexities presented by this kind of issue

prompted the Attorney General to suggest to Congress that the questions presented by Section 5, could best be resolved in adversary judicial proceedings with a full range of discovery techniques, the power to compel the attendance and testimony of witnesses and production of documents, and the opportunity for deliberate consideration unlimited by arbitrary time restrictions.

*Under these circumstances, the Attorney General is not prepared at this time —60 days after receipt of these statutes—to make any determination of the validity or invalidity of Acts 362 and 363 under the Voting Rights Act.* We are, however, continuing to gather information and facts on the issues presented. You will note that the Voting Rights Act specifically provides that the failure of the Attorney General to object shall not "bar a subsequent action to enjoin enforcement of such" acts. Should our subsequent investigation persuade us that the acts in fact violate the 15th Amendment, the Voting Rights Act or other applicable federal legislation, we will take appropriate legal steps to raise the issues in court, or, if litigation is initiated by others to participate therein in an appropriate manner.

*I want to make clear that no inference of approval or disapproval is to be drawn from the failure of the Attorney General to object within the statutory period. The fact is that we have been unable to reach a decision within the alloted time on the basis of available evidence.* I also point out that the acts in question are not effective until January 1, 1971 and, therefore any person interested in or aggrieved by this legislation has an available opportunity to seek judicial relief.

Finally, you may be interested to know that because of the difficulties experienced in this case in trying to carry out his decision-making responsibilities under the Voting Rights Act, the Attorney General has directed me to study the authority of the Department to conduct formal administrative hearings on such submissions so that a decision can

be based on a complete record of sworn testimony and documentary exhibits."

It is conceded by the parties that no further communication or action has come from the Attorney General of the United States on this matter since this letter. The Attorney General's suggestion that the questions presented to him in this submission by Mississippi under Section 5 could best be resolved in adversary judicial proceedings is a suggestion that is not open to this Court under Section 5. As the Supreme Court has made expressly clear, we would be without any jurisdiction to rule on this case under Section 5 except to the limited extent indicated above. We cannot perform his duties for him.

Since Mississippi's new laws have not been subjected to the required federal scrutiny, they are still in a state of suspended animation. Unless and until the State obtains a declaratory judgment from the United States District Court for the District of Columbia or resubmits its laws to the Attorney General of the United States so that he can proceed to discharge the duty imposed upon him by Section 5 of the Voting Rights Act of 1965, the acts involved in this case may not be given any effect so as to change qualifications, prerequisites, standards, practices or procedures set out in the laws which were in effect in 1964.

The plaintiffs are entitled to an immediate injunction against defendants in their official capacities, restraining any enforcement of House Bills 362 and 363 of the Mississippi Legislature, 1970 Regular Session, and requiring the immediate pending general elections to be held and conducted under the laws of the State of Mississippi which were in force and effect on November 1, 1964.

The relief granted is exclusively premised on the absence of valid compliance with Section 5 of the Voting Rights Act of 1965. Since the relief granted makes it both premature and unnecessary, the Court expressly pretermits any ruling upon (a) the right of the plaintiffs to maintain this action in the class forms sought, (b) upon the motion of applicants to intervene and (c) upon the right to injunctive or other relief on any of the remaining bases set out in the complaint.