STOULIG, Judge.
This appeal, filed by plaintiff-appellee from an adverse judgment of the district court, poses for our consideration the validity of the bond election held on April 6, 1971, which authorized the issuance and sale of general obligation bonds of the City of New Orleans.
The pertinent facts are: On January 14, 1971, the Council of the City of New Orleans adopted Ordinance No. 4455 (Mayor Council Series) ordering and calling an election to authorize the issuance and sale, in the aggregate principal amount of $14,000,000, of general obligation bonds of the City of New Orleans. The purpose for the issuance of said bonds, as declared in the ordinance and published in the notice of Special Election, was for acquiring fire fighting equipment; construction of public buildings (Parish Prison and completion of the Cultural Building); street paving, drainage, street lighting and other public improvements; and physical improvements and site acquisitions, parks, playground and neighborhood health, recreation and welfare facilities. The election was called pursuant to, and in conformity with, Act 4 of 1916 amending the Constitution of 1913, reenacted in Article XIV, Section 24 of the Constitution of 1921, as amended by Acts 178 and 182 of 1924, and Act 340 of 1936 and Act 533 of 1962 and Acts 575 and 576 of 1966, subsequently adopted as amendments to the Constitution, and Act 377 of 1970.
As specified in the call, the election was held on April 6, 1971, in which all registered qualified electors were permitted to vote without the requirement of ownership *49 of real property. It is the validity of this aspect of the election which is being challenged.
On the following day, the City Council met, canvassed and promulgated the results of the election.
Plaintiff, who is a qualified elector of the City of New Orleans and the owner of realty subject to ad valorem taxation, maintains that the failure to restrict the right to vote in the election to qualified property owners is in violation of the Constitution and Laws of the State of Louisiana. For this reason he contends the election is invalid.
In 1970, the legislature enacted Act 377 which provides:
“Section 1. In the event any provision of the Constitution or laws of the State of Louisiana limiting the right to vote upon the incurring of debt or the levy of special taxes to qualified voters who are taxpayers, should prove to be unconstitutional as a result of a decision or decisions by the Supreme Court of the State of Louisiana or the Supreme Court of the United States, the proposition for the incurring of such debt or levy of such special taxes may nevertheless be submitted to all qualified voters and such debt may be incurred or such special taxes may be levied upon the affirmative vote of a majority of all qualified voters voting thereon, upon compliance with and subject to all other terms and conditions of the Constitution and laws relating to the incurring of such debt or levy of such special taxes.
“Section 2. The provisions of Act 4 of the Legislature of 1916, as amended, are hereby continued in full force and effect except that the provisions of Section 4 thereof with respect to the qualifications of electors in bond elections shall be subject to the provisions of Section 1 hereof.”
This act declares the intention of the legislature that should the provision limiting the election to ad valorem taxpayers prove to be unconstitutional by any decision of the United States Supreme Court or the Louisiana Supreme Court then in that event the election to authorize the sale of bonds would be open to the general electorate.
In certain types of bond elections the United States Supreme Court has held that voting limited to property taxpayers only is violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution.
In Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the United States Supreme Court held that a state law which restricted the right to vote in elections for school district board members to parents of school children and owners or lessees of taxable real property violated the Equal Protection Clause of the Fourteenth Amendment. The Court stated:
“ ‘ * * * Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizen any effective voice in governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.’ Kramer, pp. 626-627, 89 S.Ct. p. 1889.”
On the same day the Supreme Court in Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), applied the principles enunciated in the Kramer case and held unconstitutional the Louisiana Statutes which restricted the right to vote in a municipal utility revenue bond election to property holding taxpayers. It reasoned since the utility charges used to repay such revenue bonds *50 would fall indiscriminately upon nonprop-erty owners as well as property owners and as the enhancement of property values expected from the new utilities was merely incidental, there was no legitimate basis for the disenfranchisement of nonproperty owners.
Extending the rationale expressed in the Kramer and Cipriano cases, the Supreme Court in the case of the City of Phoenix, Arizona v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), ruled that it was a breach of the Equal Protection Clause of the Fourteenth Amendment to limit the franchise to property owners in an election to approve general obligation bonds whose funds were to be used for general municipal improvements. In that case, the circumstances of which are strikingly similar to those at hand, the City of Phoenix held an election to authorize the issuance of $60,450,000 in general obligation bonds, the funds to be derived from which were to be used for sewers, parks, police and public safety, building, and libraries. Arizona law provided that property taxes were to be levied to service this indebtedness, although the City was legally privileged to use other funds for this purpose. Arizona law additionally provided that only otherwise qualified voters who were also real property taxpayers were permitted to vote on these bonds. The bond issue was approved by a majority of those voting and the election was contested by petitioners whose argument was twofold. First, it was contended that since the Arizona statutes required that property taxes be levied to service the bonds, a special burden was placed upon the owners of property; and, secondly, it was argued that as the general taxing power of the municipality, which served as security for the bonds, was largely dependent on property tax revenues, an unavoidable burden was placed only upon those who own property. Both arguments were denied by the Supreme Court which upheld the district court’s conclusion that there was no significant difference between the revenue bonds of the Cipriano case and the general obligation bonds at issue and that the exclusion of nonproperty owning voters was therefore unconstitutional under Cipriano and Kramer.
In the course of its decision, the Court elaborated on its reasons for holding that in an election to approve the issuance of general obligation bonds the differences between the interests of property owners and of nonproperty owners are not sufficiently substantial to justify excluding the latter from the franchise.
First, it noted that all residents of the City have a substantial interest in the public facilities and services available and would be affected substantially by the outcome of the election. Thus, there was no overriding interest of the property owners which would have justified the placing of the power of the election in their hands alone.
Secondly, the Court observed that although under Arizona law the bonds were ostensibly to be paid by revenues obtained through real property taxes, there were other funds which were legally available for this purpose. Thus, the tax monies of non-property owners could be used for the servicing of the bonds.
Lastly, the Court reasoned that although property taxes may initially be paid by the owner, a significant part of the ultimate burden would be borne by the tenant in the form of higher rent or the consumer, in the case of commercial establishments, in the form of increased prices for goods or services.
The rationale of the Phoenix[1] decision is clearly apposite to the circumstances surrounding the instant case and as such is controlling. Accordingly, the alterna *51 tive directive contained in Act 377 of 1970 which provides that the proposition for incurring of such debts be submitted to all qualified voters should prior constitutional provisions “prove to be unconstitutional as a result of a decision * * * by the * * * Supreme Court of the United States” was properly invoked.
It is urged by counsel for plaintiff that the City of New Orleans was without authority to call and hold the election which is the subject-of this suit because of the specific holding of the Supreme Court of Louisiana in Hebert v. Police Jury of Parish of Vermilion, 258 La. 41, 245 So.2d 349 (decided February 24, 1971, rehearing denied March 29, 1971). Our analysis of that case has convinced us, for the following reasons, that this contention is without merit.
The Court in Hebert invalidated a special bond and tax election in Road District No. 7 of Vermilion Parish in which the electorate at large was permitted to vote. It reasoned that where purely local roads were involved participation in the election should have been limited to property holders whose property would have been enhanced in value by the roads and who would have been taxed by the assessment. In reaching its decision the Court reviewed relevant United States Supreme Court opinions, noting that the only cases which had been decided involved general community-wide revenue bonds, or utility, or school matters and that in each the Court had been careful to state that it was not invalidating property taxes altogether. After citing City of Phoenix, Arizona v. Kolodziej-ski, supra, the Court quoted Justice White’s statement that “Placing such power in property owners alone can be justified only by some overriding interest of those owners which the State is entitled to recognize.” 245 So.2d at page 354. The Court then concluded that the improvement of these rural roads was such an interest:
“Since roads are an improvement to the adjacent property, it is reasonable that the property owners be permitted to determine whether their property shall be so improved. Particularly is this true when the roads are to be paid for by the owners of the property in the road district in question rather than by the taxpayers of the parish generally. * * * ” 245 So.2d at 354.
We are now asked to hold that the community improvements authorized at the election in this case must likewise benefit only those property owners whose property is located adjacent to those particular streets to be paved, drained or lighted, and only those citizens who reside in the neighborhood where the parks, playground and neighborhood health, recreation and welfare facilities are to be constructed or improved. Clearly, such a holding would not be justified. The election in Hebert was called to approve the issuance of bonds for the construction of purely local roads in that district which were considered to be essentially improvements to the adjacent property as opposed to thoroughfares serving all residents. It should be readily apparent that such bonds are totally different in character from the general obligation bonds for diverse public improvements which are herein involved. The fact that these city-wide improvements will necessarily be limited to varied specific geographic points is not sufficient to bring the bond issue subject of this suit within the ambit of the very restrictive rationale of the Hebert case.
As amended in 1965, 42 U.S.C. § 1973c (Section 5 of the Voting Rights Act of 1965) provides that whenever certain states or political subdivisions “enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964,” the change must be submitted to the United States District Court for the District of Columbia for a declaratory judgment that it will not have the effect of denying or abridging the right to vote on account of race or color. Alter *52 natively, the change can be submitted to the Attorney General of the United States for determination according to an outlined procedure.
It is conceded that none of the procedures required by Section 5 was followed. Plaintiff, citing Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), therefore argues that any change in voting procedure, no matter how insignificant, requires compliance with Section 5.
The trial judge ruled that the statute was inapplicable, noting that allowing plaintiff to use the statute to limit voting would be diametrically opposed to the general purpose of that law.
It seems clear to us that Act 377 of 1970 “continued in full force and effect” all previous voting requirements and procedures except those which have specifically “prove[d] to be unconstitutional as a result of a decision or decisions by the Supreme Court of the State of Louisiana or the Supreme Court of the United States.” It is not a legislative attempt to alter the existing voting rights of the electorate but rather is a statutory implementation of our bond election laws to provide full compliance with the mandate of the United States Supreme Court as to voter participation, wherever applicable.
This case involves a general obligation bond election, the funds from which are to be used for general municipal improvements. The City of Phoenix case invalidated a similar election restricted to real property taxpayers, holding, in effect, that all otherwise qualified voters must be allowed to participate in such an election. Thus, it was a pronouncement of the Supreme Court of the United States, rather than Act 377 of 1970, which effected the change in the voting procedures as was employed by the City of New Orleans in this election.
We do not believe that Act 377 of 1970 created an essentially different “ * * * standard, practice, or procedure with respect to voting * * * ” than in effect on November 1, 1964. The effect of Act 377 of 1970 was to place this bond election under the general election laws of Louisiana in which all qualified voters are entitled to vote. While there has been a change, this change has been to a general election law-which no one contests as invalid, and under which Louisiana may prescribe voter qualifications. See Perez v. Rhiddlehoover, 186 So.2d 686 (La.App. 4th Cir. 1966), writs refused 249 La. 451, 187 So.2d 438 (1966).
We therefore conclude that the requirements of Section 5 are inapplicable to any changes made by Act 377 of 1970.
For the foregoing reasons, the judgment of the lower court is affirmed.
Affirmed.

. In Stewart v. Parish School Board of the Parish of St. Charles, 400 U.S. 884, 91 S.Ct. 186, 27 L.Ed.2d 129 (1970), the Supreme Court cited the City of Phoenix case in declaring restrictive franchise unconstitutional in school board elections.