Thomas HAWTHORNE and Emory Newman, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

John BAKER, in his official capacity as Chairman of the State Democratic Executive Committee of Alabama; State Democratic Executive Committee of Alabama; J. Holt Etheridge, Chairman of the Henry County Executive Committee; Henry County Democratic Executive Committee, as a committee and all county Democratic executive committees similarly situated; and Democratic Party of the United States, Defendants.

Civ. A. No. 89–T–381–S.

United States District Court,
M.D. Alabama, S.D.

Aug. 20, 1990.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, Ala., James U. Blacksher, John C. Falkenberry, Leslie Proll and Edward Still, Birmingham, Ala., for plaintiffs.

Fournier J. Gale, III, Gregory H. Hawley, Maynard, Cooper, Frierson & Gale, James L. North, Birmingham, Ala., Susan Russ, Montgomery, Ala., John H. England, Jr., England & Bivens, Tuscaloosa, Ala., for Baker and State Democratic Comm.

Fred D. Gray, Tuskegee, Ala., Solomon Seay, Montgomery, Ala., for plaintiff-intervenor Keith.

Solomon Seay, Montgomery, Ala., for deponents Ala. Democratic Party, Jerome Gray and Joe Reed re m/protective order and m/quash only.

Vincent H. Cohen, Anthony L. Sutin, John C. Keeney, Roger L. Patton, Jr., Washington, D.C., David Schoen, Montgomery, Ala., for defendant DPUS.

Christine A. Varney, Gen. Counsel, Democratic National Committee, Washington, D.C., for defendant DNC.

Philip H. Smith, Talladega, Ala., for Talladega County Democratic Executive Committee.

Alston Keith, Jr., Selma, Ala., for Dallas County Democratic Executive Committee.

Clifford W. Cleveland, Prattville, Ala., for Autauga County Democratic Executive Committee.

Shelby County Democratic Executive Comm., Montevallo, Ala., pro se.

Winston Griggs, Henry County Democratic Executive Comm., Headline, Ala., pro se.

Raymond Bailey, Chair, Baileyton, Ala., for Cullman CDEC.

James Harris, Chair, Wedowee, Ala., for Randolph CDEC.

Dorman Walker, Montgomery, Ala., for Geneva, Madison, St. Clair, Tuscaloosa, Pickens, Chambers Bibb, Montgomery, Marion, Coffee, Lawrence, Marengo and Hale CDECs.

Gary White, Double Springs, Ala., for defendant Winston CDEC.

J. Milton Coxwell, Jr., Monroeville, Ala., for Monroe CDEC.

Robert M. Seale, Livingston, Ala., for Sumter CDEC.

Wallace H. Lindsey, III, Butler, Ala., for Choctaw CDEC.

William T. Musgrove, Jr., Florence, Ala., for Lauderdale CDEC.

Lee B. Williams, Grove Hill, Ala., for defendant Clarke CDEC.

Joe Macon, Wetumpka, Ala., for defendant Elmore CDEC.

James M. Prestwood, Andalusia, Ala., for defendant Covington CDEC.

Before JOHNSON, Circuit Judge, HOBBS, Chief Judge, and THOMPSON, District Judge.

## ORDER

MYRON H. THOMPSON, District Judge:

Plaintiffs Thomas Hawthorne and Emory Newman, on behalf of themselves and other African–American Democrats in Alabama, claim in this lawsuit that recent changes in the way members of the State Democratic Executive Committee and members of 47 of the 67 County Democratic Executive Committees are selected must be precleared under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c. This three-judge court has been convened to hear these claims pursuant to 28 U.S.C.A. § 2284 and 42 U.S.C.A. § 1973c. We conclude that the changes are subject to preclearance as to the state committee and as to 45 of the county committees.

## I.

On April 17, 1989, the plaintiffs filed this lawsuit in the United States District Court for the Middle District of Alabama, claiming that the Democratic Party at its local, state, and national levels has denied them and other African–American citizens of Alabama an opportunity equal to that of white citizens for representation on party governing bodies. The plaintiffs rested their claims on § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973, and on the fourteenth and fifteenth amendments to the United States Constitution as enforced through 42 U.S.C.A. § 1983. The plaintiffs named as defendants the Democratic Party of the United States, the State Democratic Executive Committee of Alabama and its chair, and the Henry County Democratic Executive Committee and its chair. The single-judge district court certified a plaintiff class of all black Democrats in Alabama. The court also certified a defendant class of all 67 County Democratic Executive Committees in Alabama.

Under the State Democratic Executive Committee's existing plan for selecting its members, each of the state's 105 House districts elects two persons, one male and one female, to serve four-year terms. The state committee then authorizes a number of other organizations to appoint additional persons to serve on the committee. One of these organizations is the Alabama Democratic Conference ("ADC"), a state-wide, predominantly black political organization. The ADC appoints 23 members to serve on the committee. The state committee's existing plan, as last modified in 1983, was precleared by the United States Attorney General.

In April 1989, shortly before this lawsuit was filed, the state committee adopted a new plan for selecting its members. The committee proposed to change from a fixed requirement of 23 additional appointments to a formula designed to guarantee that the proportion of black persons on the committee would at least equal the proportion of blacks in the general population. Instead of allowing the ADC to fill the appointed seats from among all black Democrats, the state committee's new plan called for additional members to be appointed only from among the unsuccessful black candidates, in descending order according to the number of votes each received in the committee election. The United States Attorney General refused to preclear this plan, noting his particular concern about the provision which allowed the appointed slots to be filled only from among blacks

who ran unsuccessful campaigns.[1] The Attorney General wrote that this "change ... could result in selection of persons in majority black districts who had failed to attract local black support." [2]

In January 1990, in response to the Attorney General's objection, the state committee modified its new plan for selecting members. This proposal, like the previous one, abolishes the right of the ADC and other groups to appoint additional members. The new plan, however, modifies the provision governing the number of blacks on the state committee; it requires that the proportion of black persons on the state committee must be at least equal to the proportion of blacks in the general population *or* the proportion of blacks voting in the Democratic gubernatorial primary, whichever is greatest. The plan also modifies the manner in which this requirement is to be met; it provides that the black members elected in the primary are to select the additional blacks, but only from the blacks who qualified but were not elected.[3] In March 1990, the state committee submitted the new plan to the Attorney General, but he has yet to issue a decision.[4] In that same month, the state committee began accepting qualification papers of candidates under the new plan for the June Democratic gubernatorial primary. Coun-

sel for the state committee informed the court at oral argument, however, that, although the June primary election has now passed and committee members have now been elected, the state committee has not implemented the part of the new plan changing the method of appointing blacks to the committee.

Like the state committee, 45 of the County Democratic Executive Committees across the State of Alabama have altered their systems for selecting members, and many have implemented them without preclearance from the Attorney General. Seventeen of these committees adopted plans which merely provide for the appointment of members in addition to those who are elected. The plans for 16 of these counties, however, differ from the state committee's plan in that they provide for the appointment of *both* black and white additional members.[5] The seventeenth committee's plan—the plan for the Autauga County Democratic Executive Committee—is similar to the state committee's in that it provides for the appointment of blacks only. The other 28 county committees have altered the process by which members are elected; they have redrawn district lines, changed the nature of the units from which members are elected,[6] or changed the num-

1. The 1989 plan also proposed to change the way in which the state committee's Vice–Chairperson for Minority Affairs is selected and the way in which blacks are appointed to the state committee's executive board. Under existing rules, the President of the ADC automatically serves as Vice–Chairperson for Minority Affairs, and the 23 committee members appointed by the ADC elect three of their number to serve on the executive board. Under the proposed 1989 plan, the Vice–Chairperson of Minority Affairs would be elected by the entire state committee, and the ADC's three executive board seats would be eliminated. The Attorney General objected as well to these provisions in the plan.

2. Letter from James P. Turner, Acting Assistant Attorney General, to Albert W. LaPierre, Alabama Democratic Party, dated December 1, 1989.

3. The plan also provides for selection of the Vice–Chairperson for Minority Affairs by the elected black members, and guarantees black members a proportionate share of seats on the executive board.

The primary purpose behind all these changes, according to counsel for the state committee, is the transfer of authority over who will fill the appointed seats from the exclusive control of the ADC to all black elected members of the state committee, including independents and those affiliated with the Alabama New South Coalition, a new, predominantly black organization. Defendants' brief filed on July 9, 1990, at 5.

4. Since the state committee submitted its plan for preclearance, the Attorney General has requested additional information and thereby extended his time to render a decision. *See* 28 C.F.R. § 51.37.

5. These 16 committees are from the following counties: Baldwin, Chilton, Clay, Dale, Dallas, Geneva, Jefferson, Lowndes, Marion, Randolph, Russell, Tallapoosa, Tuscaloosa, Walker, Wilcox, and Winston.

6. Many propose to elect their members from county commission districts rather than from precincts or beats.

ber of members elected from a particular district.[7]

On March 22, 1990, the plaintiffs filed additional claims in this lawsuit alleging that the state committee and many, if not all, of the 67 county committees were proceeding to implement new plans for selecting their members, without having first secured preclearance under § 5 of the Voting Rights Act of 1965, as amended. After this three-judge court was convened to hear the plaintiffs' § 5 claims, the plaintiffs dropped their claims against 20 of the county committees.

## II.

Section 5 of the Voting Rights Act of 1965, as amended, requires that certain jurisdictions, including the State of Alabama and its subdivisions, preclear any change in a "standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U.S.C.A. § 1973c. A jurisdiction may obtain preclearance in either of two ways: by securing a determination from the United States District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," *id.*; or by submitting the change to the Attorney General of the United States and receiving no objection. *Id.*

Under § 5, the permissible scope of the three-judge court's inquiry is limited to whether a change "is covered by § 5, but has not been subjected to the required federal scrutiny." *Allen v. State Board of Elections*, 393 U.S. 544, 561, 89 S.Ct. 817, 829, 22 L.Ed.2d 1 (1969). It is undisputed that the state committee's and the county committees' new plans have not been precleared. The only point of inquiry for this

court, therefore, is whether the plans are covered by § 5.

### A.

■ We must address first the contention of the state and the county committees that they are not entities subject to the requirements of § 5. This court has previously held that political parties in this state, to the extent they are empowered by the state to conduct primary elections and to have their national convention delegates selected, are subject to § 5. *MacGuire v. Amos*, 343 F.Supp. 119 (M.D.Ala.1972) (three-judge court) (per curiam) (Rives, Johnson, and Varner, JJ.). "Where the political parties are given such head by a specific statutory grant of authority," the court explained, "their actions rise to the level of actions by the State," with the right to vote in their elections "specifically guaranteed in the 1965 Voting Rights Act." *Id.* at 121. *Cf. United States v. Board of Commissioners of Sheffield*, 435 U.S. 110, 122, 98 S.Ct. 965, 974, 55 L.Ed.2d 148 (1978) ("§ 5 has to apply to all entities exercising control over the electoral processes within the covered States or subdivisions").

The Attorney General's regulations reflect a similarly inclusive reach for § 5. They provide that "Changes with respect to the conduct of primary elections at which party nominees, delegates to party conventions, or party officials are chosen are subject to the preclearance requirement of section 5." 28 C.F.R. § 51.7. In fact, pursuant to this regulation, the Attorney General approved the state committee's plan in 1983 and objected to a revised version in 1989, expressly noting in his objections that "the selection of officers and members of the [State Democratic Executive Committee] in this submission may not be implemented without meeting the preclearance requirements of Section 5."[8] "Given the central

---

**7.** These 28 committees are from the following counties: Barbour, Bibb, Chambers, Cherokee, Clarke, Coffee, Coosa, Crenshaw, DeKalb, Elmore, Escambia, Fayette, Hale, Henry, Houston, Lamar, Lauderdale, Lawrence, Lee, Limestone, Marengo, Montgomery, Morgan, Perry, Pickens, Shelby, St. Clair, and Washington.

The plans for at least 22 of these committees also include the appointment of additional

members, in most cases both black and white members, but in four cases black members only.

**8.** Letter from James P. Turner, Acting Assistant Attorney General, to Albert W. LaPierre, Alabama Democratic Party, dated December 1, 1989.

role of the Attorney General in formulating and implementing § 5, [his] interpretation of its scope is entitled to particular deference." *Dougherty County v. White*, 439 U.S. 32, 39, 99 S.Ct. 368, 373, 58 L.Ed.2d 269 (1978).

Based on *MacGuire*, we therefore hold that, to the extent the State Democratic Party is empowered to conduct primary elections in which it selects members of its state committee and county committees, its actions, as well as those of its state and county committees, fall within the coverage of § 5.

## B.

■ Whether a specific change adopted by a political party is covered by § 5 turns on whether the change is a "standard, practice, or procedure with respect to voting," 42 U.S.C.A. § 1973c, which has the "potential for discrimination" against African–Americans. *NAACP v. Hampton County Election Commission*, 470 U.S. 166, 181, 105 S.Ct. 1128, 1137, 84 L.Ed.2d 124 (1985) (emphasis omitted). The Voting Rights Act of 1965 fails to define when a change relates to voting other than to define the term "voting" to "include all action necessary to make a vote effective." § 1973l(c)(1). Supreme Court cases teach, however, that Congress intended the Act to reach any enactment which altered election procedures "in even a minor way," *Allen*, 393 U.S. at 566, 89 S.Ct. at 832, and that the phrase "standard, practice, or procedure" must be given the "broadest possible scope." *Id.* at 567, 89 S.Ct. at 832. *See also, e.g., Dougherty County*, 439 U.S. at 37–38, 99 S.Ct. at 372. These cases also teach that it is not the task of a three-judge court, such as ours, "to determine whether the changes at issue ... in fact resulted in impairment of the right to vote, or whether they were intended to have that effect," *Hampton County Election Commission*, 470 U.S. at 181, 105 S.Ct. at 1137, but that "that task is reserved by statute to the Attorney General or to the District Court for the District of Columbia." *Id.* Our

task is to determine whether discrimination is a "plausible consequence" of the change. *Turner v. Webster*, 637 F.Supp. 1089, 1092 (N.D.Ala.1983) (three-judge court) (Vance, J.).

■ With the above principles in mind, we conclude that the state committee's proposed new plan has the potential to discriminate with respect to voting for two reasons. First of all, the plan includes new provisions which require that the state committee's additional black members be selected from those blacks who qualified in the Democratic gubernatorial primary but lost. This "loser eligibility" provision effectively requires that persons qualify to run for the committee in order to be eligible for the appointed positions. This provision affects voting and has the potential to discriminate because it could conceivably encourage blacks to run against other blacks, or against whites who are the choices of blacks, and thus split and dilute the black vote.

Second, under the state committee's new plan, the number of additional black appointments would no longer be a guaranteed 23 but would depend, in part, on the number of blacks elected: the more blacks elected, the fewer blacks who must be appointed to meet the plan's racial proportion requirement. The plan's provisions for election and appointment of blacks are thus inextricably linked. In fact, the state committee admits in its brief that the appointive provisions in its new plan are "aimed at remediating discrimination";[9] they are, according to the state committee, "meant to compensate" for the electoral system's "failures."[10] In the absence of the plan's appointment provisions, the state committee would have to modify its elective procedures to achieve the same results. The proposed new plan's provisions for election *and* appointment of blacks relate directly to voting; and they have the potential to discriminate because they could result in fewer blacks on the state committee than under the existing plan.

---

**9.** Defendants' brief filed on July 9, 1990, at 14.

**10.** *Id.* at 21.

The state committee argues that appointments in general do not relate to voting under § 5. Whether § 5 covers appointments is an issue this court need not reach. Our narrow holding is that under the special circumstances presented here, where the appointment process is intended to ameliorate the elective process and thus is directly tied to it, the appointment process is covered by § 5. The state committee also argues that its appointment procedure is an affirmative action plan which should not fall within § 5's coverage. Whether affirmative action plans, as such, should or should not fall within § 5's coverage is again a matter we need not reach. Our concern is merely that, because certain features in the plan—however they are labeled—relate to voting and have the potential to discriminate, the plan must be precleared under § 5.

### C.

■ The plaintiffs claim that the new plans adopted by 47 of the county committees have several features which bring the plans within § 5's coverage. We agree as to 45 of these committees. Twenty-eight of the county committees have in some manner altered the way they elect their members.[11] Some have redrawn district lines, some have changed the nature of the units from which members are selected, and others have changed the number of members elected from a particular district. It is well established that such changes affect voting and have the potential for discrimination, and as such are covered by the requirements of § 5. *See City of Lockhart v. United States,* 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983) (increase in number of seats on city governing body subject to preclearance); *Georgia v. United States,* 411 U.S. 526, 531–32, 93 S.Ct. 1702, 1706, 36 L.Ed.2d 472 (1973) (changes in electoral boundaries and creation of multi-member districts subject to preclearance); *Perkins v. Matthews,* 400 U.S. 379, 391–92, 91 S.Ct. 431, 438, 27 L.Ed.2d 476 (1971) (changes in electoral boundaries and from ward to at-large elections both covered under § 5); *Allen,* 393 U.S. at 569, 89 S.Ct. at 833 (change from district to at-large voting covered under § 5); 28 C.F.R. § 51.13(e) (§ 5 covers "any change in the constituency of an official or the boundaries of a voting unit").

Sixteen of the county committees have provisions for the appointment of both black and white members to supplement elected members.[12] We find that the provision for white appointments has the potential to discriminate as to voting. Should black electoral success in elections trigger the selection of additional white members, such appointments could dilute black voting strength by reducing the proportion of members who are chosen by and thus represent black voters. *See Perkins,* 400 U.S. at 388, 91 S.Ct. at 437 ("right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote") (citation omitted).

The only change in the Autauga County Democratic Executive Committee's plan is for the appointment of blacks. Counsel for the committee contends that such a plan has no potential to discriminate. Whether such a change, by itself, is subject to preclearance is an issue we need not reach.[13] We understand from the committee's counsel that the districts from which the county committee's members are elected were adopted after November 1, 1964, the benchmark date for § 5 coverage,[14] but were never submitted for preclearance for use in committee elections. The committee's plan is therefore due to be submitted to the Attorney General for this reason.

---

11. *See* note 7, *supra.* As noted, some of these 28 committees have provisions in their new plans for the appointment of additional members, both black and white. For the reasons given later in this order, we conclude that, because these plans provide for the appointment of white members, they are subject to § 5 preclearance as well.

12. *See* notes 5 & 7, *supra.*

13. *See* 28 C.F.R. § 51.12 ("Any change affecting voting, even though it ... ostensibly expands voting rights ... must meet the section 5 preclearance requirement").

14. *See* 42 U.S.C.A. § 1973c.

We cannot reach similar conclusions as to the remaining two of the 47 county committees: the Greene and Monroe County Democratic Executive Committees. Plaintiffs have failed to submit any evidence that these two county committees have changed the way they select their members.

### III.

■ The final issue for the court is an appropriate remedy. Because the purpose of § 5 is "to *prevent* the institution of changes which might have the purpose or effect of denying or abridging the right to vote on account of race or color," *Perkins*, 400 U.S. at 385, 91 S.Ct. at 435 (emphasis added), this court is obligated, absent "unusual circumstances," to enjoin enforcement of a change that should have been precleared but was not. *Henderson v. Graddick*, 641 F.Supp. 1192, 1202 (M.D. Ala.1986) (per curiam) (three-judge court) (Johnson, Hobbs, and Thompson, JJ.).[15] The Supreme Court has indicated that special circumstances warranting an exception might be present where, because elections have already been held pursuant to an unprecleared voting requirement, it would be inequitable to return completely to the status quo ante pending submission of the change for preclearance. Under these circumstances, the Court explained, "it might be appropriate to enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so or if the required federal approval is not forthcom-

ing." *Perkins*, 400 U.S. at 396–97, 91 S.Ct. at 441.

Counsel for the state committee informed this court at oral argument that its new plan has yet to be implemented in full and that the status quo is effectively still the 1983 plan. Under these circumstances, we conclude that we must enjoin enforcement of the new plan unless and until it is precleared.[16] We understand, however, that the circumstances are quite different with regard to many of the 45 county committees whose plans, we conclude, must be precleared. Many committees have already enforced their new plans, and new members have been chosen under them. Plaintiffs and the county committees agree that the court should enjoin enforcement of the new plans in such circumstances only if the counties are unable to obtain preclearance after having been given a reasonable opportunity to do so. We cannot, however, determine on the present record which county committees fall within this category. We will therefore give the plaintiffs and the county committees 14 days to submit to the court proposed relief as to each of the 45 county committees.

It is so ORDERED.

HOBBS, Chief Judge, concurring in part and dissenting in part.

I concur fully with the judgment of this court that the changes to the rules of the State Democratic Executive Committee (SDEC) must be precleared by the United

---

**15.** *See also Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam) (acts covered by § 5 "are not now and will not be effective as laws until and unless precleared pursuant to § 5"); *Georgia v. United States,* 411 U.S. at 541, 93 S.Ct. at 1711 (future enforcement of reapportionment plan would be enjoined unless and until precleared).

**16.** The state committee suggested at oral argument that, if this court should find that the proposed new plan is subject to preclearance, it should impose as an interim remedy a variation of the new plan, in which the elected black members of the state committee, rather than the ADC, would select the additional black members, but without the loser eligibility requirement. The state committee contends that the

existing 1983 plan is unfair to black voters who are not members of the ADC. *See* note 3, *supra.* Whether the existing plan is unfair or illegal for reasons unconnected with § 5 and whether, for these reasons, the plan should not be continued in force are matters outside the jurisdiction of this three-judge court. *See Henderson v. Graddick,* 641 F.Supp. at 1209 (although a three-judge court has broad remedial powers under § 5, those powers do not extend beyond the relief necessary to vindicate the specific right at issue). These matters should be addressed instead, if anywhere in this on-going litigation, to the single-judge court which is currently considering a challenge to the existing plan under § 2 of the Voting Rights Act and the fourteenth and fifteenth amendments to the United States Constitution.

States Justice Department pursuant to section 5 of the Voting Rights Act. I also agree with the court's judgment with respect to the various county plans. I do not agree, however, that our remedial powers are as limited as suggested by the majority opinion and, therefore, must respectfully dissent from that portion of the judgment.

The majority concludes that its only recourse is to enforce the Democratic Party's 1983 plan of electing and choosing members to the SDEC. Neither the law nor the facts of this case require such a resolution. The state Democratic Party made three changes to the executive committee election and selection process: 1) the "loser eligibility" rule for qualifying for an appointed seat; 2) the manner in which the number of appointed seats is calculated; and 3) the provision placing the appointive powers in the hands of the elected Afro–American members of the SDEC. As more thoroughly discussed in the majority opinion, the first two changes directly affect voting and could have a potential for discrimination. Thus, it is appropriate that these two changes not be enforced unless preclearance is obtained. For the time required for the Democratic Party to achieve preclearance of a plan, I would agree with the majority opinion that the 1983 plan for appointing black seats at twenty-three should be followed and effect should not be given to the loser-eligibility rule.

I do not believe, however, that the portion of the 1983 plan placing complete power over appointing Afro–American seats with the Chairman of the Alabama Democratic Conference (ADC) must be enforced. Both parties agree that the ADC represents only a portion of the Afro–American members of the Democratic Party. The Democratic Party has attempted to change this patently unfair and undemocratic practice by placing the appointive power in a body of Afro–Americans elected by their representative group. As implicitly recognized by the majority, this change from a selection process that ignores a significant portion of the Afro–American Democratic voters to a process which democratically elects those Afro–American members who will make the appointments has no plau-

sible potential to discriminate against Afro–American voters. I, therefore, would permit the newly elected black members of the SDEC to select the twenty-three persons to fill the additional seats as part of an interim remedy until a plan is proposed which meets the requirements of Section 5 of the Voting Rights Act.

This is not to say that the entire election and selection plan does not have to be precleared. Obviously, it represents a comprehensive program that should not be submitted piecemeal to the Justice Department. As a three judge panel, however, we have the authority to fashion a remedy "appropriate" to the situation presented to us. *See NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 183 n. 36, 105 S.Ct. 1128, 1138 n. 36, 84 L.Ed.2d 124 (1985); *Perkins v. Matthews*, 400 U.S. 379, 396–97, 91 S.Ct. 431, 440–41, 27 L.Ed.2d 476 (1971). Factors relevant in fashioning an appropriate remedy include "the nature of the changes complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5." *Perkins*, 400 U.S. at 396, 91 S.Ct. at 441. The latter factor is important insofar as it indicates a "deliberate defiance of the [Voting Rights] Act." *Allen v. State Board of Elections*, 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969). The Democratic Party has made a substantial effort in this case to comply with the preclearance requirements of the Voting Rights Act. It first submitted proposed changes to the Attorney General in 1989. In response to objections made by the Attorney General to that plan, the Democratic Party drafted the plan before this Court. It was submitted to the Attorney General in March, 1990, with a request for expedited consideration pursuant to 28 C.F.R. § 51.34(a). Even without expedited consideration, the March, 1990 filing was long enough before the June, 1990 election to allow the Attorney General the full sixty days usually required to evaluate a submission. 28 C.F.R. § 51.9. The Attorney General, however, has requested additional time for considering the Democratic Party's submission and has yet to make a final

determination on this plan. Under these circumstances, and given that the change concerning appointment power has no potential to discriminate, I believe it is appropriate to give effect as an interim plan to the change sought by the Democratic Party with respect to the appointment power.

Although not strictly applicable in this case, the Voting Rights Act cases addressing reapportionment plans also are instructive in determining what might be an "appropriate" remedy. In these cases, voting districts had to be redrawn to account for new congressional seats added or removed after the national census. Because the old plans were in violation of the constitutional principle of one man one vote, they could not be enforced. *See Upham v. Seamon,* 456 U.S. 37, 38, 102 S.Ct. 1518, 1519–20, 71 L.Ed.2d 725 (1982). Often, however, election dates approached before new plans could be precleared by the Attorney General. Federal three judge panels, therefore, routinely had to draft interim reapportionment plans that would allow the elections to go forward. The Supreme Court cautioned these three judge district court panels to be mindful of the political choices of the entities they were reviewing while being sure to adopt interim plans that honored the Constitution. *Upham v. Seamon,* 456 U.S. at 43, 102 S.Ct. at 1522. Thus, the standard under which the district courts operated in forming interim plans was to defer to the political judgments of the legislating body where such deference would not result in a Constitutional or Voting Rights Act violation. *Upham v. Seamon,* 456 U.S. at 41, 102 S.Ct. at 1521, *quoting White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973); *see Burton v. Hobbie,* 543 F.Supp. 235 (M.D.Ala.1982) (three judge court) (Johnson, Hobbs, and Thompson, JJ.).

I see no reason for not applying the same rationale to the changes before us. The 1983 plan is itself discriminatory against a significant portion of the Afro–American Democratic voters. *See Burton v. Hobbie,* 543 F.Supp. at 243–43 (Johnson, J., concurring) (refusing to accept an interim remedy which itself was discriminatory). The choice to shift the appointive power from the exclusive control of one Afro–American group to a more democratically elected Afro–American group represents the resolution of a political battle within the Alabama Democratic Party. That choice has no potential for discrimination, and thus no potential for violating the Constitution and Voting Rights Act. Faced with a choice between the two plans, I think it not only "appropriate" but also wise to defer to the Party's political choice and allow the Afro–American elected members of the SDEC to appoint additional members. A refusal to allow this change adopted by the Democratic Party could well result in a continuation for several years of the unfair practice, which the Party sought to correct, of having one Afro–American group impose its choices irrespective of the wishes of other Afro–American groups.