The GREENE COUNTY RACING
COMMISSION, et al.,
Plaintiffs,

v.

The CITY OF BIRMINGHAM,
et al., Defendants.

No. CV–91–N–1930–S.

United States District Court,
N.D. Alabama, S.D.

Aug. 26, 1991.

have so determined. Clearly this court has jurisdiction to entertain a properly stated claim under § 1985(3).

Rose Mary Sanders, Carlos A Williams, Chestnut Sanders Sanders Williams & Pettaway, Selma, Ala., John H England, Jr., England & Bivens P.C., Tuscaloosa, Ala., for plaintiffs.

Tony Cooper, pro se.

James K Baker, William M Slaughter, James C Huckaby, Jr., Haskell Slaughter Young & Johnston, Birmingham, Ala., Fred D Gray, Gray Langford Sapp McGowan & Gray, Tuskegee, Ala., for defendants.

Before DUBINA, Circuit Judge and PROPST and NELSON, District Judges.

EDWIN L. NELSON, District Judge:

### I. Statement of the Case.

The Voting Rights Act of 1965, 42 U.S.C. § 1973, *et seq.*, (the Voting Rights Act) prohibits any state or political subdivision of a state from imposing or applying any "qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." 42 U.S.C. § 1973.[1] Section 5 of the Voting Rights Act provides that when certain states and political subdivisions designated by the United States Attorney General[2] "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, or practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 ... no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure" unless and until such state or political subdivision shall have sought and obtained a declaratory judgment in the United States District Court for the District of Columbia "that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. Alternatively, the affected state or political subdivision may preclear any proposed change by submitting it to, and securing the approval of, the United States Attorney General. *Id.*

In this civil action the plaintiffs claim the defendants did not preclear certain alleged changes in voting procedures to be used in connection with a public referendum. They seek injunctive and declaratory relief to prevent the defendants from conducting a referendum among the voters of Jefferson County, Alabama, on Tuesday, August 27, 1991, to determine whether greyhound racing and pari-mutuel wagering thereon will be legalized in that county.[3] The plaintiffs are: the Greene County Racing Commission, a public corporation formed for the

---

[1]. The Voting Rights Act of 1965 was enacted to effectuate the provisions of the Fifteenth Amendment to the United States Constitution and to insure that no citizen's right to vote is denied or abridged on account of race or color. *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973).

[2]. The entire State of Alabama has been designated by the Attorney General as subject to the provisions of the Voting Rights Act of 1965. 28 C.F.R. Part 51, Appendix.

[3]. The complaint, filed on Thursday, August 15, 1991, contains, in addition to this claim under the Voting Rights Act, a number of claims under the constitution and laws of the State of Alabama and the federal constitution. Pursuant to the provisions of 42 U.S.C. § 1973c and 28 U.S.C. § 2284, Chief Judge Gerald B. Tjoflat designated Circuit Judge Joel F. Dubina and District Judge Robert B. Propst to serve with the undersigned as a three-judge court to hear and determine claims under Section 1973c. The three-judge court conducted a final hearing on the merits of the Voting Rights Act claims on Thursday, August 22, 1991, and Judge Dubina, at the close of that hearing, announced that the court would deny the motion for interlocutory relief. This opinion and order will dispose of the claims under the Voting Rights Act on the merits.

State law claims and federal constitutional claims are not before the three-judge court. By separate order, the district judge to whom this action was assigned has dismissed all state law claims under the provisions of 28 U.S.C. § 1367, as amended. The federal constitutional claims remain pending before the single-judge court.

purpose, *inter alia,* of regulating greyhound racing and pari-mutuel wagering in Greene County, Alabama; the Greene County Board of Education, a beneficiary of certain income from the proceeds derived from pari-mutuel wagering on greyhound racing in Greene County, Alabama; the Greene County Commission, the governing body of Greene County, Alabama; and Cynthia Harris, a registered voter in Birmingham, Jefferson County, Alabama.[4] The defendants are: the City of Birmingham, Alabama; the Jefferson County Commission, the governing body of Jefferson County, Alabama; the Birmingham Racing Commission, a public corporation organized and empowered to regulate thoroughbred horse racing and pari-mutuel wagering thereon in Birmingham, Alabama; Birmingham Sports Management and Milton McGregor, a corporation and one of its principal shareholders.[5]

The requested relief will be denied and the Voting Rights Act claims will be dismissed with prejudice.

## II. The Facts.

Except to the extent that it is authorized by specific statute, gambling, including pari-mutuel wagering on horse racing and greyhound racing, is prohibited in the State of Alabama as being in violation of the state's criminal code. (*Ala. Code* §§ 13A–12–20 to –31 (1975).[6] The Greene County Racing Commission and pari-mutuel wagering on greyhound racing were authorized by Act No. 75–376 on September 19, 1975 and a greyhound racing facility apparently has operated in Greene County for a number of years. In 1984 the Alabama legislature authorized the establishment of a racing commission in the City of Birmingham and also legalized horse racing and pari-mutuel wagering on such horse racing in that city. 1984 Ala. Acts P. 159 (codified at *Ala. Code* § 11–65–1 *et seq.*) (Horse Racing Act) The Horse Racing Act provided that it would be effective only if horse racing and pari-mutuel wagering thereon were approved at an election conducted in the City of Birmingham and in the county or counties in which the City, "or any part thereof," was located. The act further required approval by both "a majority of all the voters casting votes in such referendum and ... a majority of the voters casting votes in such referendum who reside in the [City of Birmingham]" before it could become effective. *Ala. Code,* § 11–65–46. At an election conducted on June 12, 1984, majorities of the voters in Jefferson County and in Birmingham approved the establishment of the Birmingham Racing Commission and horse racing with pari-mutuel wagering. (Defendants' Exhibit 2) Under the provisions of the Horse Racing Act, the Birmingham Racing Commission issued a license for the ownership of a horse racing facility located in Birmingham, Alabama and an operator's license to conduct horse racing and pari-mutuel wagering thereon at such racing facility. The holders of those licenses and related interests constructed a horse racing facility and instituted a horse racing program including pari-mutuel wagering.

Horse racing in Birmingham proved to be an economic failure and the original holder of the licenses eventually sought the

---

**4.** The original plaintiff was Randy Gann, a registered voter in Shelby County, Alabama. On the morning of the hearing the court permitted Mr. Gann to withdraw. Plaintiff Cynthia Harris was allowed to intervene.

**5.** The Voting Rights Act limits State governments and their political subdivisions. Neither Birmingham Sports Management nor Milton McGregor is a state or a political subdivision of a state. There is no claim that either is or has threatened to conduct any election or voting activity on behalf of a state or political subdivision. Neither is a proper defendant in an action brought to enforce provisions of the Voting Rights Act.

**6.** *Ala. Code* § 13A–12–31 provides:

The provisions of this article [relating to the suppression of gambling places] shall not apply to pari-mutuel betting at race meetings authorized by statute. All presently effective state statutes and laws and locally adopted ordinances and laws pursuant thereto legalizing, authorizing or allowing greyhound races and betting and wagering thereon are hereby expressly and specifically preserved, saved and excepted from any repealer provisions contained anywhere in the Criminal Code.

protection of the bankruptcy laws of the United States. Through an arrangement not entirely clear from the record, but seemingly with the approval of the bankruptcy court, a second horse racing operator was permitted to conduct horse racing and pari-mutuel betting operations at the racing facility. It, too, was an economic failure. According to legislative findings made in 1991, the original holder of the licenses and its successor incurred total losses of $22,500,000 from the time the track opened until horse racing ended there in 1990. Act of July 28, 1991, No. 187, § 1; Plaintiffs' Exhibit 4.

At the time Act No. 84–131 was enacted, the City of Birmingham was situated entirely in Jefferson County, Alabama, and the referendum on the approval of horse racing and pari-mutuel betting was limited to that county. The City has since extended its boundaries by annexation into neighboring Shelby County.

At its regular session in 1991, the legislature enacted Act No. 91–187 (Dog Racing Act)[7] which substantially amended Act No. 84–131, *inter alia*, to authorize greyhound racing and pari-mutuel betting thereon in the City of Birmingham.[8] Issues have been raised under the Voting Rights Act with regard to a number of passages and

provisions in Act No. 91–187. Section 4(b)[9] of the act, amending *Ala.Code* § 11–65–4, provides where an election has previously been held "that authorized either horse racing and pari-mutuel wagering thereon or greyhound racing and pari-mutuel wagering thereon, but not both such racing activities," as it has in Birmingham, the City is "mandated" to call for an election prior to January 1, 1992 "to determine whether greyhound racing and pari-mutuel wagering thereon shall be permitted in [Birmingham]."[10] Section 4(b) further provides that no voters who live outside Jefferson County shall be permitted to vote in the referendum. No election called for the purpose of considering either horse racing or greyhound racing may be "held on the date [the City of Birmingham] holds an election for its mayor or for two or more members of its governing body." Act of July 28, 1991, No. 187, § 4(c); Plaintiffs' Exhibit 4.

The mayor of Birmingham recommended, and its council adopted, Resolution No. 1257–91 by which the Jefferson County Commission was requested to call an "election to be held throughout the county on August 27, 1991, for the purpose of determining whether or not greyhound racing and pari-mutuel wagering thereon shall be

7. Act No. 91–187 was allowed to become law on July 28, 1991 without the signature of the governor. (Plaintiffs' Exhibit 4)

8. Both of the relevant acts, Act No. 84–131 and Act No. 91–187, speak of authorizing racing and pari-mutuel betting in "Class 1 Municipalities." A Class 1 Municipality is defined as a city of 300,000 or more inhabitants according to the 1970 decennial census. *Ala.Code* § 11–40–12. Birmingham was and is the only Class 1 Municipality in the State of Alabama. The legislature has chosen to describe the city to which Acts 84–131 and 91–187 are applicable in terms other than by name in order to comply with certain provisions of the Alabama constitution having to do with local versus general laws. The court is not so constrained and, accordingly, will refer to the applicable city by its name.

9. Section 4 of the Dog Racing Act, *Ala.Code* § 11–65–4, as amended, makes provisions for the holding of elections at which the voters of a Class 1 Municipality and of the county in which the majority of the people of the city reside must approve before racing and pari-mutuel

betting will become legal. Section 4(a), clearly, applies only to Class 1 Municipalities in which no racing commission, horse or dog racing, or pari-mutuel wagering existed before the enactment of Act No. 91–187. On the other hand, Section 4(b) was intended to apply in Class 1 Municipalities which had previously authorized either horse racing and pari-mutuel betting or greyhound racing and pari-mutuel betting. Birmingham and Jefferson County did, in fact, conduct a referendum in 1984 at which horse racing and pari-mutuel wagering were approved. Therefore, only Section 4(b) applies to Birmingham and Jefferson County. Section 4(a) was apparently included to maintain the legal fiction that there is some possibility of Class 1 Municipalities in Alabama other than the city of Birmingham. Of course, that possibility exists only if *Ala.Code* § 11–40–12 is amended to change the definition of a Class 1 Municipality.

10. The Act provides that "the governing body of [the city of Birmingham] shall determine the date of such election." Act of July 28, 1991, No. 187, § 4(b).

permitted in the part of the City located within the County." (Defendants' Exhibit 2) As requested, the Jefferson County Commission promptly set the election for August 27, 1991. The question to be presented to the voters is:

> Do you favor the authorization of greyhound racing and pari-mutuel wagering thereon in that part of the City of Birmingham located in Jefferson County, as provided in Chapter 65, Title 11, Code of Alabama 1975? (Plaintiffs' Exhibits 2 and 3)

The only other measures on the ballot in any part of the county concern the renewal of certain ad valorem taxes dedicated to public school use. There are no candidates for public office listed on any ballot in the county. The greyhound racing question is not on the ballot to be used in that part of Birmingham that is situated in Shelby County, Alabama. (Plaintiffs' Exhibit 1)

Approximately one week before the scheduled vote, the relevant voter roles reflected the following with regard to total voters and the racial composition of the electorate:

|  | Total | White | % | Black | % |
|---|---|---|---|---|---|
| Jefferson County | 344,638 | 234,264 | 67.9 | 102,282 | 32.1 |
| Birmingham/Jefferson County | 133,977 | 53,810 | 40 | 75,300 | 60 |
| Shelby County | 56,150 | 51,879 | 92.4 | 3,854 | 7.6 |
| Birmingham/Shelby County | 82 | 81 | 98.78 | 1 | 1.22 |

(Defendants' Exhibit 1; Joint Exhibit 2)

---

### III. Discussion of the Issues.

#### A. The Voting Rights Act.

■ Section 5 of the Voting Rights Act requires a covered jurisdiction, before implementing a change in voting procedures, to preclear that change either judicially or administratively and no such change "will be effective ... until and unless cleared" by one of the two statutorily provided methods. *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam). *See also United States v. Board of Supervisors*, 429 U.S. 642, 645, 97 S.Ct. 833, 834, 51 L.Ed.2d 106 (1977); *Hathorn v. Lovorn*, 457 U.S. 255, 269, 102 S.Ct. 2421, 2430, 72 L.Ed.2d 824, *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 15, 73 L.Ed.2d 1401 (1982). The court's consideration of these claims is more sharply focused by prior interpretations of the act from the Supreme Court and other lower federal Courts. Congress intended that the Voting Rights Act be given "the broadest possible scope." *Allen v. State Board of Elections*, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969). The court in *Allen* concluded further "that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.* at 566, 89 S.Ct. at 832. The act "was aimed at the subtle, as well as the obvious...." *Id.* at 565, 89 S.Ct. at 831.

■ Whether a specific change made by a covered political jurisdiction constitutes a change in a "voting qualification or prerequisite to voting, or standard, or practice, or procedure with respect to voting" that is subject to the preclearance requirement of Section 5 turns on whether such a change has the "potential for discrimination" against black persons. *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 181, 105 S.Ct. 1128, 1137, 84 L.Ed.2d 124 (1985). The court is required to give considerable deference to interpretations of the Voting Rights Act by the Attorney General. *United States v. Board of Comm'rs*, 435 U.S. 110, 131, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978); *Hardy v. Wal-*

*lace,* 603 F.Supp. 174, 177 (N.D.Ala.1985) (three-judge court) (Vance, J.).[11]

■ The function of this three-judge court is limited. We may not inquire into the discriminatory purpose or effect of the changes. *Perkins v. Matthews,* 400 U.S. 379, 384, 91 S.Ct. 431, 435, 27 L.Ed.2d 476 (1971).

> The only questions to be decided by ... the three judge court ... is whether or not the State of Mississippi or any of its political subdivisions have acted in such a way as to cause or constitute a voting qualification or prerequisite to voting or standard, practice or procedure with respect to voting within the meaning of Section 5 of the Voting Rights Act of 1965, which changed the situation that existed as of November 1, 1964, and whether or not prior to doing so the City had filed a request for declaratory judgment with the United States District Court for the District of Columbia or asked approval of the Attorney General of the United States....

*Perkins,* 400 U.S. at 384, 91 S.Ct. at 435 (quoting the unreported oral opinion of the district judge to whom the case was first assigned). While the court may not inquire into any discriminatory purpose or effect of challenged changes, it must examine the facts with a view toward deciding whether "discrimination is a 'plausible consequence'

of the change." *Hawthorne v. Baker,* 750 F.Supp. 1090, 1095 (M.D.Ala.1990) (three-judge court) (Thompson, J.) (quoting *Turner v. Webster,* 637 F.Supp. 1089, 1092 (N.D.Ala.1986) (three-judge court) (Vance, J.). *See NAACP v. Hampton County Election Comm'n,* 470 U.S. at 181, 105 S.Ct. at 1137; *McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984); *Dougherty County, Georgia Bd. of Educ. v. White,* 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews,* 400 U.S. at 383–385, 91 S.Ct. at 434–35; *Allen v. State Bd. of Elections,* 393 U.S. at 555, 89 S.Ct. at 826.

#### B. *The Claims.*

The district judge to whom the action was initially assigned perceived two potential grounds for the plaintiffs' claim that the Dog Racing Act could not be implemented until it has been precleared under Section 5 of the Voting Rights Act: (1) the act excluded voters of that part of Birmingham situated in Shelby County and (2) it excluded all the voters of Shelby County from participation in the referendum to consider the question of dog racing in Birmingham. On Friday, August 16, 1991, the court entered an order scheduling the hearing on the motion for interlocutory relief

---

**11.** The Attorney General has determined that certain types of changes affect voting for purposes of the Voting Rights Act. Examples of such changes are:

> Changes affecting voting include, but are not limited to, the following examples:
> (a) Any change in qualifications or eligibility for voting.
> (b) Any change concerning registration, balloting, and the counting of votes and any change concerning publicity for or assistance in registration or voting.
> (c) Any change with respect to the use of a language other than English in any aspect of the electoral process.
> (d) Any change in the boundaries of voting precincts or in the location of polling places.
> (e) Any change in the constituency of an official or the boundaries of a voting unit (e.g., through redistricting, annexation, deannexation, incorporation, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections).

> (f) Any change in the method of determining the outcome of an election (e.g., by requiring a majority vote for election or the use of a designated post or place system).
> (g) Any change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices.
> (h) Any change in the eligibility and qualification procedures for independent candidates.
> (i) Any change in the term of an elective office or an elected official or in the offices that are elective (e.g., by shortening the term of an office, changing from election to appointment or staggering the terms of offices).
> (j) Any change affecting the necessity of or methods for offering issues and propositions for approval by referendum.
> (k) Any change affecting the right or ability of persons to participate in political campaigns which is effected by a jurisdiction subject to the requirement of Section 5.
> 28 C.F.R. § 51.13.

and directing the plaintiffs to file a brief "setting forth each issue to be heard at the ... hearing." In their brief, the plaintiffs stated they would pursue three claims at the hearing. They were: (1) by limiting voting to Birmingham residents who live in the Jefferson County portion of the City, Birmingham residents of the Shelby County portion of the City have been "de-annexed": (2) the holding of an election to consider dog racing and pari-mutuel betting is itself a change from practices and procedures as they existed on November 1, 1964; and (3) the scheduling of a special election is a change requiring preclearance. By the time of the hearing, one day after the brief was filed, the plaintiffs had expanded their allegations to include claims that: (4) the prohibition on conducting the referendum in conjunction with the election of the mayor or two council members had the potential to adversely effect black voters; (5) the date was selected to coincide with the beginning of the school year and would impact on the ability of black voters to get to the polls; (6) failure to give legal notice to the voters of Shelby County concerning the proposed enactment of the Dog Racing Act was a change from prior law; and (7) the question to be presented on August 27 is a change from the question presented in connection with the Horse Racing Bill because it does not include any question concerning the establishment of a racing commission.

### C. *Plaintiffs' Standing.*

At the beginning of the hearing, the plaintiffs conceded that none of the plaintiffs except Cynthia Harris have standing to bring these claims under Section 5 of the Voting Rights Act. Because the jurisdiction of federal courts is limited to actual "cases" and "controversies" this court can adjudicate only the "legal rights" of litigants. *Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899 (1885). A plaintiff has no standing to bring an action unless he can "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). The plaintiff must also demonstrate that the injury "fairly can be traced to the challenged actions" and "is likely to be redressed by a favorable decision." *Valley Forge College,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). The Supreme Court has said:

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected ... does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.

*Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1368–69, 31 L.Ed.2d 636 (1972).

■ None of the plaintiffs associated with Greene County has alleged any actual or threatened injury fairly traceable to the challenged conduct of the defendants. Those plaintiffs have alleged nothing more than the potential for economic injury traceable only to the perceived competition to be created by the existence and operation of a greyhound racing facility in Birmingham, Alabama. That is not a denial or abridgement of the right to vote on account of race or color or otherwise. These plaintiffs having suffered no actual or threatened injury from the conduct of the defendants, the Voting Rights Act claims of the Greene County Racing Commission, the Greene County Board of Education and the Greene County Commission will be dismissed with prejudice.

■ The remaining plaintiff is Cynthia Harris, a registered voter who lives in the Jefferson County portion of the City of Birmingham. As such resident there can be no serious question concerning Ms. Harris' standing to raise at least some of the Section 5 claims. For example, had Ms.

Harris proved that the selection of August 27, 1991, had the potential for discrimination on the basis of race or color, she would clearly have a stake in the outcome of this action and would be in a position to benefit from a favorable ruling of the court. Ms. Harris' standing to raise other claims is less clear. It is difficult to see how she has been adversely affected by the exclusion of Shelby County voters from the referendum. However, since Ms. Harris has standing as to some claims and the others are insubstantial, it is not necessary that the court determine the parameters of her standing with great precision. Accordingly, the court will consider each of the grounds alleged in support of the claim for injunctive and declaratory relief.

### D. *Discussion of the Claims.*

■ The plaintiff Harris is entitled to relief only if "discrimination is a 'plausible consequence' of the change." *Hawthorne v. Baker*, 750 F.Supp. at 1095; *NAACP v. Hampton County Election Comm'n*, 470 U.S. at 181, 105 S.Ct. at 1137; *McCain v. Lybrand*, 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984); *Dougherty County, Georgia Bd. of Educ. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews*, 400 U.S. at 383–385, 91 S.Ct. at 434–35; *Allen v. State Bd. of Elections*, 393 U.S. at 555, 89 S.Ct. at 826. This minimal requirement has been spoken of in terms of the "potential for discrimination." *NAACP v. Hampton County Election Comm'n*, 470 U.S. at 181, 105 S.Ct. at 1137. While the necessary showing is slight, it "cannot be treated as so minimal as to write this requirement completely out of existence." *Hawthorne v. Hurley*, 756 F.Supp 527, 531 (M.D.Ala.1990) (three-judge court) (Thompson, J.). In this case, the plaintiffs have failed to offer any credible evidence that any one of the challenged practices, qualifications or prerequisites to voting has any potential for discrimination on the basis of race or color.

■ The original claims made by these plaintiffs focused strongly on the exclusion of Shelby County voters from the election. Indeed, the only plaintiff at the time who possibly had standing, Randy Gann, was alleged to be a registered voter in Shelby County.[12] With regard to the claims that the exclusion of Shelby County voters, either those living inside or outside Birmingham, constitute changes requiring preclearance before they can be implemented, the court makes several observations. First, no voter in Shelby County was qualified or permitted to vote in the referendum conducted under the Horse Racing Act on June 12, 1984 and to permit them to vote now would likely be a change subject to scrutiny under the Voting Rights Act. Second, 92.4% of the voters of Shelby County are white and 7.6% are black. The Jefferson County voting population is 67.9% white and 32.1% black. These figures suggest that the exclusion of the Shelby County voting population could not possibly have any discriminatory purpose or effect with regard to black voters in Birmingham or Jefferson County. In the Shelby County portion of Birmingham, 98.78% of the voters are white and 1.22% are black. As with the general population of Shelby County, the exclusion of a voting population that is more than 98% white could not possibly discriminate against blacks in Birmingham and Jefferson County. The court notes that no potential voter from Shelby County has claimed that the conduct of this referendum has the potential to discriminate against him.

■ The plaintiffs, in related claims, assert that the setting of the referendum and the setting of a special election each require preclearance under Section 5. At 28 C.F.R. § 51.17, the Attorney General has determined that special elections are subject to preclearance "to the extent that the jurisdiction makes changes in the practices

---

12. The court notes that though one claim raised in the original complaint, and pressed at the hearing, was that the Shelby County portion of Birmingham was "de-annexed" for purposes of the Dog Racing Bill, Mr. Gann's name does not appear on the list of registered voters in that portion of Birmingham. (Defendants' Exhibit 1)

or procedures to be followed." [13] While the regulation might suggest on its face, that every special election requires preclearance, the cases have consistently held that the plaintiff must still make a minimal showing of a potential for discrimination. *See NAACP v. Hampton County Election Comm'n*, 470 U.S. at 181, 105 S.Ct. at 1137; *McCain v. Lybrand*, 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984); *Dougherty County, Georgia Bd. of Educ. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews*, 400 U.S. at 383–385, 91 S.Ct. at 434–35; *Allen v. State Bd. of Elections*, 393 U.S. at 555, 89 S.Ct. at 826; *Hawthorne v. Baker*, 750 F.Supp. at 1095. The regulation requires preclearance only where changes have a potentially discriminatory purpose or effect. The plaintiffs have produced no evidence that the mere setting of the dog racing referendum has the potential of discrimination on the basis of race, color or otherwise.

■ Next, the plaintiffs assert that the date selected for the referendum and the restrictions on the date to be selected represented changes having the potential for discrimination and that preclearance is required. The date selected for an election can give rise to a preclearance requirement under Section 5. *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 105 S.Ct. 1128; *Lucas v. Townsend*, 486 U.S. 1301, 108 S.Ct. 1763, 100 L.Ed.2d 589 (1988) (opinion in chambers, Kennedy, J.); *Hawthorne v. Hurley*, 756 F.Supp 527 (M.D.Ala.1990), *vacated*, — U.S. —, 111 S.Ct. 1408, 113 L.Ed.2d 440.[14] Both *NAACP v. Hampton County Election Commission* and *Lucas v. Townsend* involved actual changes in previously established election dates and were predicated upon findings that the changes had the "potential for discrimination." In *Hawthorne v. Hurley*, the court considered an actual change in the date for a special meeting of the Alabama State Democratic Committee to select new black members but concluded that there was "no indication whatsoever that [blacks] will in any way be disadvantaged" by the change in the meeting date. *Hawthorne v. Hurley*, 756 F.Supp. at 531.

The plaintiffs claim, first, that by forbidding local officials from setting the referendum on the same date that Birmingham's mayor or at least two of its council members were being elected, the Dog Racing Act has the effect of discouraging voters from participating in the election. Only inferentially do they argue that this factor would have a greater impact on black voters than it would on white voters. They presented no firm credible evidence to support the claim. On the contrary, the leading black politician in the City of Birmingham, Mayor Richard Arrington, disputed the claim. The only evidence to support this argument came in the form of opinion that was not shown to be based upon sufficient experience or factual background. The best that can be said for this claim is that any election having no candidates for public office is likely to produce a lower voter turnout than will an election at which candidates for public office are running. There is no evidence to suggest that any particular racial group will be impacted to a greater or lesser degree than will another racial group.

Second, the plaintiffs claim that the close proximity of the dog racing referendum to the opening of the public schools will discourage blacks from voting. The only evidence presented in support of this argument came from the plaintiff, Cynthia Har-

---

**13.** 28 C.F.R. § 51.17 provides in pertinent part:

    (a) The conduct of a special election (e.g., an election to fill a vacancy; an initiative, referendum, or recall election; or a bond issue election) is subject to the preclearance requirement to the extent that the jurisdiction makes changes in the practices or procedures to be followed.

    (b) Any discretionary setting of the date for a special election or scheduling of events lead-

ing up to or following a special election is subject to the preclearance requirement. 28 C.F.R. § 51.17.

**14.** That *Hawthorne* was later dismissed as moot does not diminish its persuasive value. The court cites it merely to illustrate the manner in which similar claims have been treated.

ris. She testified that on August 27 she would be engaged in enrolling two children in school. She conceded on cross-examination that she did not work and could vote after enrolling her children in school except that she had "other things scheduled." Clearly, these "other things" were personal to her and had nothing whatsoever to do with the Dog Racing Act. The court notes that schools will be opening for whites, blacks and all other racial groups at the same time. There is no evidence that the opening of schools will impact blacks to a greater or lesser degree than whites.

On this point, it should be noted that Mayor Arrington recommended the date for the referendum and the date was selected by resolution of the Birmingham City Council which has a six to three black majority.

Finally, the plaintiffs claim that the lack of a question on the dog racing ballot concerning the establishment of a racing commission represents a change subject to pre-clearance. They have not presented any evidence from which the court could conclude that this change has any potential for discrimination on the basis of race or color.

IV. Conclusion.

The court will enter final judgment dismissing the Voting Rights Act claims of all the Greene County plaintiffs for want of standing and dismissing the claim of plaintiff Cynthia Harris on the merits.

DUBINA, Circuit Judge, and PROPST, J., concur.